Sabita J. Soneji (State Bar No. 224262)
V Chai Oliver Prentice (State Bar No. 309807)
Matthew Lanahan (*Pro Hac Vice* forthcoming)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950
ssoneji@tzlegal.com
vprentice@tzlegal.com

Ariana J. Tadler (*Pro Hac Vice* forthcoming)
A.J. de Bartolomeo (State Bar No. 136502)
**TADLER LAW LLP**
One Pennsylvania Plaza, 36th Fl.
New York, NY 10119
Telephone: (212) 946-9300
Facsimile: (212) 273-4375
atadler@tadlerlaw.com
ajd@tadlerlaw.com

*Counsel for Plaintiffs and the Proposed Class*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAVANNAH SMITH & TYLER KRAUEL, individually, and on behalf of a class of similarly situated persons,<br><br>      Plaintiffs,<br><br>      v.<br><br>JUUL LABS, INC.,<br><br>      Defendant. | Case No. 3:19-cv-05838<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 5

PARTIES .............................................................................................................................. 5

FACTS ................................................................................................................................. 10

I.    The Vision behind JUUL: Use Condemned Tobacco Industry Practices to
Recreate the Magic of the Cigarette among a New Generation of Captive Consumers. ........... 10

II.   The JUUL E-cigarette Is a Sleek, Stylish, and "Insanely Simple" to Use
Drug Delivery Device That Was Designed to Appeal to Youth ....................................... 11

III.  JUUL Markets Its Products as an Alternative to Combustible Cigarettes Even
Though JUUL's Products Are More Potent and Addictive and Designed to
Appeal to Nonsmokers .................................................................................................... 14

IV.  JUUL Fraudulently Concealed Material Information about the Highly
Addictive Nature of Its E-Cigarettes .............................................................................. 18

V.   JUUL Marketed Its Products to Youth Because JUUL Knew That Was the Best
Way to Build a Strong Base of Addicted Users. .............................................................. 21

VI.  JUUL Used Flavors and Food Imagery to Attract
Nonsmoking Adolescents and Adults. ............................................................................ 22

VII. JUUL Promoted Its Products to Young People With Youth-Targeted Marketing. ................. 24

    A.   JUUL's Youth-Focused Advertising ...................................................................... 24

    B.   JUUL's Social Media Campaign ............................................................................ 26

    C.   JUUL Promotional Emails Indiscriminately Promoted
JUUL Regardless of Age Verification ................................................................... 29

    D.   JUUL's Promotional Parties and Sampler Events Hooked Young New
Users with Free Starter Kits .................................................................................. 30

    E.   JUUL's Brick-and-Mortar Store Sales Targeted Youth ......................................... 30

    F.   JUUL Invested in Direct Interactions with Middle School and
High School Students ............................................................................................. 31

VIII. JUUL Is Not a Safe or Healthy Product For Anyone and
Particularly Not for Youth and Young People. ............................................................... 32

IX.  JUUL's Marketing of Its Products as "Safe" or a "Safer" Alternative to
Cigarettes Is Unsupported and Misleading. .................................................................... 33

X.   As a Result of JUUL's Deceptive Advertising and Youth-Focused
Marketing, JUUL Has Hooked a Huge Number of New Users, Particularly Youth. ................. 34

CLASS ALLEGATIONS ................................................................................................... 39

CAUSES OF ACTION ...................................................................................................... 41

I.    COUNT I: Violation of the California Consumer Legal Remedies Act,
Cal. Civ. Code §§ 1750, *et seq.* (on behalf of the Class) ................................................. 41

II.      COUNT II: False Advertising in Violation of California Bus. And
         Prof. Code §§17500, et. seq. (on behalf of the Class) ........................................ 45

III.     COUNT III: Fraud (on behalf of the Class) .......................................................... 46

IV.      COUNT IV: Negligent Misrepresentation (on behalf of the Class) ....................... 47

V.       COUNT V: Negligent Misrepresentation and Marketing to Underage
         Youth (on behalf of the Youth Subclass) ............................................................. 51

VI.      COUNT VI: Strict Liability Failure to Warn (on behalf of the Class
         and Youth Subclass) ........................................................................................... 54

VII.     COUNT VII: Negligent Failure to Warn (on behalf of the Class
         and Youth Subclass) ........................................................................................... 56

VIII.    COUNT VIII: California Unfair Competition Law, Cal. Bus. &
         Prof. Code §§ 17200, et seq. (on behalf of the Class) ......................................... 58

IX.      COUNT IX: Florida Deceptive and Unfair Trade Practices Act,
         Fla. Stat. § 501.203, et seq. (on behalf of the Florida Subclass)......................... 60

X.       COUNT X: Georgia Uniform Deceptive Trade Practices Act,
         Ga. Code Ann. §§ 10-1-370, *et seq.* (on behalf of the Georgia Subclass)........... 62

PRAYER FOR RELIEF ...................................................................................................... 64

JURY DEMAND ................................................................................................................. 64

Plaintiffs Savannah Smith and Tyler Krauel ("Plaintiffs"), through their undersigned attorneys, hereby bring this complaint against Defendant JUUL Labs, Inc. ("Defendant" or "JUUL" ), on behalf of themselves and all persons similarly situated, as follows:

### INTRODUCTION

1.      JUUL sells e-cigarettes and nicotine pods specifically designed both to provide a powerful hit of nicotine and to addict users. JUUL markets this addictive and harmful product in candy flavors and with viral marketing depicting JUUL as a "cool" accessory or fun, harmless pastime. And JUUL intentionally targets its marketing to young people because JUUL knows that hooking teen smokers is the best way to build a long-term captive user base. For all these reasons and those detailed below, Plaintiffs bring this class action complaint for damages, injunctive relief, and any other available legal or equitable relief to remedy the harms to Plaintiffs and the proposed Class resulting from JUUL's false, fraudulent, misleading, and negligent marketing and sales practices for its highly addictive JUUL products.

2.      Since 2015, JUUL has manufactured, marketed, and sold the JUUL e-cigarette and accompanying JUULpod nicotine cartridges. JUUL has marketed and sold JUULpods in a variety of candy-like flavors, all of which contain JUUL's proprietary, highly addictive nicotine e-liquid formula. JUUL's products and its deceptive marketing scheme have fueled what the FDA has called an epidemic of teen e-cigarette use or "vaping."

3.      Since entering the market, JUUL's sleek and easily concealable e-cigarette and its aggressive social media marketing campaign have propelled JUUL to a dominant position in the e-cigarette market. JUUL now controls more than three-quarters of the United States e-cigarette market.[1] JUUL's marketing did not just take over a large slice of the e-cigarette market, it also drove significant

---

[1] Jennifer Maloney, *JUUL Explores Opening Its Own E-Cigarette Stores*, WALL STREET JOURNAL (May 30, 2019), https://www.wsj.com/articles/JUUL-explores-opening-its-own-e-cigarette-stores-in-u-s-1155923526 2.

market expansion. Industry analysts have credited JUUL as singlehandedly reviving the e-cigarette market, whose sales had been stagnating for years.[2]

4.      Much of JUUL's growth has come from getting underage youth hooked on JUUL's highly addictive products. JUUL has fueled a drastic increase in teen tobacco use over the last three years. The Centers for Disease Control and Prevention ("CDC") reported a 78% increase in e-cigarette use among high school students from 2017 to 2018. Use by middle school students increased by almost 50% during the same period. In 2018, more than one in five high school students reported vaping in the previous 30 days, compared to less than one in fifty in 2011.[3]

5.      JUUL's explosive growth, especially among young people, was entirely by design. JUUL's founders met and began forming their vision for JUUL while pursuing master's degrees in product design at Stanford. The founders set out to design a product that would "take tobacco back to being a luxury good and not so much a drug delivery device."[4] To do so, JUUL designed an extra sleek, futuristic-looking and concealable e-cigarette; developed a mechanism to provide the highest dose of nicotine of any e-cigarette without the throat irritation that high levels of nicotine typically cause; created and named a handful of fun and "cool" candy-like flavors; hired young models and social media celebrities known as "influencers" to promote the product as a hip party accessory; and utilized social media platforms such as Twitter, Instagram and YouTube to create a viral appeal among youth.

6.      To market its nicotine products, JUUL's founders turned to a tried and true playbook: the deceptive, youth-focused marketing techniques that the tobacco industry employed for decades

---

[2] Erin Bodwin, *MORGAN STANLEY: A startup valued at $15 billion is singlehandedly reviving the e-cig market, and Big Tobacco should be worried*, BUSINESS INSIDER (July 8, 2018), https://www.businessinsider.com/JUUL-vape-startup-reviving-e-cig-market-2018-7.
[3] CDC, *The E-cigarette Epidemic Among Youth*, SURGEON GENERAL'S ADVISORY ON E-CIGARETTE USE AMONG YOUTH, https://www.cdc.gov/tobacco/basic_information/e-cigarettes/surgeon-general-advisory/index.html (last visited Sep. 16, 2019).
[4] Holden Foreman, *JUUL founders call e-cigarette prototype "a luxury good" in 2005 thesis footage*, STANFORD DAILY (March 1, 2019), https://www.stanforddaily.com/2019/03/01/JUUL-founders-call-e-cigarette-prototype-a-luxury-good-in-2005-thesis-footage/.

before they were finally exposed—and banned—as a result of tobacco litigation in the 1990s and 2000s. JUUL used the now-public library of tobacco industry documents outlining their condemned practices as a how-to guide for marketing and selling its highly addictive nicotine products to a new generation of youth—all while understanding that these practices had been held to be deceptive and illegal with respect to sales of traditional cigarettes. JUUL's founders nevertheless reviewed the design and marketing techniques that the tobacco industry developed and tested over decades and distilled the most effective methods to develop JUUL's own designs, imagery and advertising that appealed to youth and evoked feelings such as luxury, freedom, relaxation, and elevated social status. JUUL then used its distilled advertising and design arsenal to launch a deceptive and, at times, covert blitzkrieg marketing campaign to make nicotine use cool again among today's youth.

7.      For example, mimicking the now-banned techniques the tobacco industry deployed to hook new users at a young age, JUUL manufactured, marketed, and sold its product in a variety of candy-like flavors, including mango, "cool" cucumber, "cool" mint, and fruit medley.

8.      Also following the tobacco industry playbook, JUUL significantly underplayed the dangers of its product, even though it was one of the most potent e-cigarette products available when it launched. Packed inside each JUULpod, which measures a mere 29.5 x 15 x 7 mm (about the size of a thumbnail), is a potent .7 milliliters of e-liquid that contains at least 5% nicotine by weight, or more than 6% nicotine by volume. The small JUULpod delivers as much nicotine as two full packs of traditional combustible cigarettes. Coupled with JUUL's e-cigarette technology, JUUL's nicotine e-liquid is also more dangerous and addictive than other e-cigarettes on the market: JUUL delivers nicotine up to 2.7 times faster than other e-cigarettes, and its e-liquid nicotine levels were as much as 20 times more potent than other e-cigarette products on the market in 2017. Moreover, JUUL specially designed its e-cigarette device and e-liquid formula to minimize the harshness of nicotine on the throat, allowing even new, non-smoker users to inhale large doses of nicotine without the immediate discomfort that such high doses of nicotine would generally cause.

9.      Despite the dangers of introducing non-smokers to huge doses of nicotine, JUUL said nothing about any of the myriad problems likely to occur from the use of the products, particularly by

youth and nonsmokers, when it launched its products. These dangers include long-term nicotine addiction; increased risk of heart disease and stroke; changes in brain functionality that lead to increased susceptibility to anxiety, depression and other addictions; decreased functionality of the endocrine system; and heightened risk of cancer.

10.     JUUL's founders set out to "take tobacco back to being a luxury good and not so much a drug delivery device." In line with that goal, many JUUL promotional emails from June 2015 to April 2016 made no mention of JUUL's nicotine content, and JUUL did not add a nicotine warning to its Twitter feed until October 2017. In 2017 and 2018, JUUL even sent representatives into middle schools and high schools to promote JUUL as a "totally safe" alternative to cigarettes—a patently untrue claim, particularly for anyone under age 26.

11.     Unsurprisingly, nearly two-thirds of surveyed youth and young[5] adult JUUL users reported that they did not know that the product always contains nicotine, believing instead that JUULing sometimes delivered only flavored water vapor. Unfortunately, many young JUUL users are now addicted to nicotine, and youth who try using JUUL are six to ten times more likely to begin smoking cigarettes than their peers who do not use e-cigarettes.[6]

12.     In 2018, after the FDA opened an investigation into JUUL's youth-targeted marketing, JUUL removed from its website and much of the internet the targeted images that were designed to appeal to youth and now suggests that JUUL exists solely for the benefit of adult smokers looking for an alternative. Although JUUL markets its product as a smoking cessation device ("Switch to JUUL"), it has not received FDA approval as modified risk tobacco product or as a nicotine replacement therapy, and the JUUL e-cigarette has not participated in any FDA approval process. Worse, the viral marketing

---

[5] *JUUL e-cigarettes gain popularity among youth, but awareness of nicotine presence remains low*, TRUTH INITIATIVE (April 18, 2018), https://truthinitiative.org/press/press-release/JUUL-e-cigarettes-gain-popularity-among-youth-awareness-nicotine-presence.

[6] *Adolescents and Tobacco: Trends*, U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES OFFICE OF POPULATION AFFAIRS, https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/index.html (last visited Sep. 16, 2019).

campaign and memes that JUUL instigated continue to live on and to seduce new users. JUUL's e-cigarettes are still as addictive as they ever were, are still sold in candy-like flavors, and can still be ordered with a subscription service on JUUL's website, and JUUL continues to hide the truth about the actual nicotine content and addictiveness of its devices. Plaintiffs bring this suit on behalf of herself and others to shine a light on JUUL's deceptive marketing and social media practices and stunningly addictive product, seek damages for those already harmed by it, and enjoin JUUL from continuing to endanger people like her.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) because (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and Defendant are citizens of different states.

14.     This Court also has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331, because one or more claims arise under federal law. This Court supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this District under 28 U.S.C. § 1391 because the Defendant is headquartered in this District and regularly transacts and solicits business in this District.

## PARTIES

### *Plaintiff Savannah Smith*

16.     Plaintiff Savannah Smith ("Savannah") lives in Atlanta, Georgia and resided there throughout the relevant period for the events described below.

17.     Prior to using a JUUL for the first time in May 2017, at the age of 17, Savannah was a regular smoker and had been since she was approximately 15.

18.     Savannah had also tried other vaping devices, Suorin Air, Blu, Smok, and the Phix among others, prior to and after trying JUUL. However, Savannah did not stick with using any of these other devices in the same manner that she used JUUL. No other brand of e-cigarette provided her the powerful "hit" that JUUL did.

19.     Prior to using JUUL for the first time, Savannah had seen JUUL advertisements and promotions on Instagram, Twitter, Facebook, Tumblr, and other social media platforms. None of the JUUL content Savannah saw before she tried using JUUL disclosed that JUUL delivers nicotine to the bloodstream at least as efficiently as cigarettes and presents a risk of addiction.

20.     Savannah tried JUUL when it was offered by one of her younger high-school-aged friends in order to quit smoking. Savannah perceived it to be a safer alternative to smoking and the marketing she saw did not contain any warnings about addiction.

21.     Savannah continued to see JUUL advertisements and promotions on Instagram and other social media platforms after she began using JUUL regularly.

22.     Savannah specifically recalls seeing the following advertisements:[7]

a.  "It's #MintMonday" advertisement that ran on JUUL's @JUULVapor Twitter account. The advertisement portrayed a tabletop from above depicting a young person's hands holding an e-reader and a coffee cup, with a JUUL e-cigarette and several green JUULpods splayed out on the table. The large text on the image reads: "Start Your Week With Cool Mint JUULPods," and smaller text adds "Crisp mint with a pleasant aftertaste." Neither the advertisement image nor the accompanying text in JUUL's Twitter "tweet" disclosed that JUULpods contained any amount of nicotine.

b.  An advertisement on JUUL's @JUULVapor Twitter account that read "Sign up and stock up. Enjoy the convenience of pods at your door every month with #JUUL Auto-ship." The advertisement provided a link to JUUL's subscription service signup page. Accompanying the text was an image of five colorful, flavored JUULpods flanked by the foods the flavors were intended to mimic (mint leaves, fresh mangoes, crème brulee, and mixed berries).

c.  An advertisement that read "Make The Satisfying Switch With JUUL." The advertisement linked to a page on JUUL's website where a consumer could purchase a JUUL Starter Kit.

d.  An advertisement that lined up eight colorful JUULpods with prominent text with the imperative: "Find Your Favorite Flavor." The only mention of nicotine is in extremely small font below the image.

e.  An advertisement depicting the JUUL device with prominent text stating "Not Your Average E-Cigarette." The text JUUL added to the Tweet accompanying the image

---

[7] *See* Attachment A for visual representations of some of the advertisements Savannah recalls seeing.

stated: "#JUUL is simple and satisfying. And it's not an e-cigarette. Here's why: [Link]."

f.   An image that read "FACT: JUUL Labs is not Big Tobacco. We are an independent vapor company on a mission to eliminate cigarettes." The advertisement did not mention that JUUL contains nicotine.

23.   Even at age 17, Savannah saw advertisements on her Facebook feed for gas stations nearby to her actual location which sold JUULpods.

24.   In addition to official JUUL advertisements, Savannah also saw user-generated content shared with the hashtag "#JUUL" that promoted use and abuse of JUUL through humorous memes such as a picture of a restroom with overlaid text reading "why are there toilets in the JUUL room" and depictions of youth using JUUL, often with the tagline "Do it for ***** JUUL."

25.   Savannah initially preferred the mango flavor because it was more palatable.  Savannah later switched to the mint flavored pods. The mango flavor pods were a major factor in Savannah deciding to use JUUL.

26.   Savannah also chose JUUL over other vape devices because the JUUL, in comparison to other e-cigarette devices, was sleeker and more concealable and provided a greater nicotine "kick" per use.

27.   Since starting to use JUUL, Savannah has a persistent cough, even in moments where she is not using her JUUL. Using JUUL has also aggravated a pre-existing skin condition.

28.   Savannah used five JUUL pods per week on average. Since August 2019, Savannah has been attempting to quit using JUUL altogether. She currently uses 1-2 pods per week. Savannah's attempts to quit JUUL have been complicated by the fact that using JUUL not only maintained her addiction to nicotine but increased it.

### Plaintiff Tyler Krauel

29.   Plaintiff Tyler Krauel ("Tyler") resides in St. Pete Beach, Florida, and resided there throughout the relevant period for the events described below.

30.   Prior to using a JUUL for the first time in 2016, at the age of 15, Tyler had never smoked a cigarette or used any nicotine containing product.

31.     Prior to using JUUL for the first time in 2016, Tyler had seen JUUL advertisements and promotions on Instagram and at gas stations. None of the JUUL content Tyler saw before he tried using JUUL disclosed that JUUL was an age-restricted product, that it contains nicotine, and delivers nicotine to the bloodstream at least as efficiently as cigarettes and presents a risk of addiction.

32.     Tyler tried JUUL because he perceived it as the "cool" new thing to do. When Tyler first tried JUUL, he was not aware that it contained nicotine.

33.     Tyler bought his first JUUL device himself, despite being underage, but thereafter, when he became a regular user, he would ask friends who were of age to buy the pods for him.

34.     Tyler continued to see JUUL advertisements and promotions on Instagram and at gas stations after he started using JUUL.

35.     Tyler specifically recalls seeing the following JUUL advertisements:[8]

a. Several advertisements from JUUL's "Vaporized" campaign, which featured an image of the JUUL e-cigarette on a colorful background next to images of young people having fun with a JUUL in hand. Tyler does not recall seeing nicotine warnings in connection with these ads.

b. Instore displays at gas stations or convenience stores that displayed JUUL e-cigarettes and flavored JUULpods in their sleek packaging without prominent warnings about JUUL's nicotine content;

c. Window display advertisements at gas stations or convenience stores that advertised $15-20 off purchases of JUUL's e-cigarette or JUUL's starter kit (e-cigarette plus JUULpod sampler with multiple flavors);

d. Window display advertisements at gas stations or convenience stores that advertised Mango flavor JUULpods without visible or prominent nicotine warnings;

e. Instagram feed advertisements posted by JUUL's official account (@JUULvapor) that depicted vacation scenes like a summery yacht at sea and a hammock on a tropical beach and asked viewers "What's your flavor destination" and encouraged viewers to "Escape with Limited Edition" JUULpod flavors including "#CoolCucumber." The images did not contain any nicotine warning and any textual warnings were hidden;

---

[8] See Attachment B for visual representations of some of the JUUL advertisements Tyler recalls seeing.

f.  Instagram feed advertisements that users posted on Instagram with the hashtag "#JUULmoment," which JUUL then reposted from its official @JUULvapor account. The images did not contain any nicotine warning and any textual warnings were hidden;

g.  Instagram feed advertisements posted by JUUL's official @JUULvapor account that advertised JUUL's "Limited Edition cool cucumber" flavored JUULpods and encouraged viewers to "Experience subtle cucumber flavor with a hint of mint – click link in bio to shop now" on JUUL.com. The images did not contain any nicotine warning and any textual warnings were hidden;

h.  Instagram feed advertisements posted by JUUL's official @JUULvapor account that advertised that JUUL's mango-flavored JUULpods were available for auto-ship subscription purchases and encouraged viewers to "Get the #JUULpod flavor you love delivered right to your door & save 15%." The images did not contain any nicotine warning and any textual warnings were hidden;

i.  JUUL advertisements that highlighted that JUUL was "BACK IN STOCK" without displaying any nicotine warnings.

36.    In addition to official JUUL advertisements, Tyler also saw user-generated content shared with the hashtag "#JUUL" that promoted use and abuse of JUUL through humorous memes and depictions of youth using JUUL or performing JUUL "tricks" such as vaping from four JUULs at the same time.

37.    Tyler preferred the mango flavor when he first started using JUUL, but now has moved to mint flavor. The mango flavor pods were a major factor in Tyler deciding to use JUUL, as it is more palatable.

38.    Tyler still uses about 8 JUUL pods per week and considers himself addicted to nicotine.

***Defendant JUUL Labs, Inc.***

39.    Defendant JUUL Labs, Inc. ("JUUL") is, and at all times alleged in this Class Action Complaint was, a Delaware corporation, based in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc., and a new company was spun out as Pax Labs, Inc. A substantial portion of the conduct discussed herein occurred while JUUL was operating as PAX Labs, Inc. ("PAX").

**FACTS**

I.    **The Vision behind JUUL: Use Condemned Tobacco Industry Practices to Recreate the Magic of the Cigarette among a New Generation of Captive Consumers.**

40.    JUUL's founders, James Monsees and Adam Bowen, began developing the product concept that would eventually become JUUL in California, while the two co-founders were pursuing master's degrees in product design at Stanford University.

41.    The co-founders considered the cigarette to be "the most successful consumer product of all time," but one that in recent years had lost its social appeal among much of society. So Monsees and Bowen set out to recreate the "magic" of the cigarette in a 21st Century product. The co-founders' vision for JUUL was to recreate the "ritual and elegance that smoking once exemplified" while also tapping into a market of "people who want to enjoy tobacco but . . . don't necessarily want to be associated with . . . cigarettes."[9]

42.    To execute this vision, JUUL's co-founders reviewed the textbook for captivating a new market with the allure of a stylish accessory to hook consumers with the addictive quality of nicotine: tobacco industry documents from the combustible cigarette's 20th century heyday. Product design and marketing techniques that would normally be kept behind closed doors as trade secrets in other industries were all accessible to JUUL because cigarette companies' internal documents were made public as part of the Master Settlement Agreement reached between the cigarette industry, governmental officials, and injured consumers to resolve the tobacco litigation of the 1990s and 2000s. With the help of the tobacco industry's playbook of now banned practices, JUUL was "able to catch up . . . in no time" to the tobacco industry.[10]

43.    JUUL also reviewed the tobacco industry's historical R&D findings and consumer testing results. Through that review, and with the help of former cigarette industry scientists, JUUL was

---

[9] Interview with James Monsees, IDEAMENSCH (April 11, 2014) https://ideamensch.com/james-monsees/.
[10] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND (Jan. 2015), https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

able to focus on creating a nicotine delivery device with the most potent nicotine hit possible and with the least associated unpleasantries. Specifically, JUUL set out to manipulate nicotine pH by using nicotine salts and adding organic acids to maximize the delivery of nicotine while at the same time minimizing the unpleasant and harsh "throat hit" that untreated nicotine was known to cause. The tobacco industry began testing the addition of organic acids to tobacco blends to reduce harshness and "facilitate the initiation" of new users as early as 1954. JUUL picked up where the industry had left off, creating a nicotine delivery device with unprecedented risks of nicotine abuse and addiction—or what nicotine purveyors like JUUL might call a strong potential for a huge captive market.

44.    JUUL was developed with nicotine addiction as a core component of its business plan. It was never designed to be a cessation product, and in July 2019, Monsees reiterated this fact in congressional testimony, stating: "I can't state more emphatically JUUL is specifically and on purpose not a cessation product."[11]

## II.    The JUUL E-cigarette Is a Sleek, Stylish, and "Insanely Simple" to Use Drug Delivery Device That Was Designed to Appeal to Youth.

45.    The JUUL e-cigarette is a thin, rectangular device that looks a lot like a USB flash storage drive. Unlike many other e-cigarettes on the market, the JUUL does not have a bulky refillable tank that stores nicotine e-liquids. Instead, JUUL's patented nicotine e-liquid comes in small cartridges known as JUULpods. JUULpods are about the size of a thumbnail and click into one end of the JUUL e-cigarette. The other end of the e-cigarette contains the device's magnetic USB charging port.

---

[11] *Hearing on E-Cigarettes and Teen Usage, Day 2*, C-SPAN (July 25, 2019), at 1:13:59, https://www.c-span.org/video/?462992-1/hearing-cigarettes-teen-usage-day-2.



46.    The entire JUUL device (e-cigarette with JUULpod) is about the same size as a stick of gum. It can easily be concealed in a pocket or pencil case, and its innocuous look makes it hard to identify as a vaping device. The device is also small enough to be largely concealed by a user's hand while using the product.

47.     Each JUULpod contains 0.7 milliliters of JUUL's patented e-liquid. JUUL has sold JUULpods in a variety of candy-like flavors, including mango, "cool" mint, "cool" cucumber, fruit medley, and crème brulee. JUULpods also contain 5% nicotine by weight—considerably more than



other e-cigarette products, which generally contain 1.2 to 3% nicotine by weight.[12] A JUULpod typically lasts for about 200 puffs and can deliver as much nicotine as two packs of cigarettes. When empty, JUULpods can be discarded and replaced with a new JUULpod.

48.     In addition to flavored nicotine e-liquid, each JUULpod also contains a silica wick, which gradually absorbs the e-liquid, connected to a metal coil. The JUUL e-cigarette contains a pressure sensor, circuit board, and battery. The pressure sensor in the JUUL detects when a user draws air through the JUULpod and signals to the battery to send electrical current to the coil in the JUULpod. The current heats the coil, which then vaporizes the e-liquid absorbed in the wick. The

---

[12] Robert K. Jackler & Divya Ramamurthi, *Nicotine arms race: JUUL and the high-nicotine product market*, TOBACCO CONTROL (Feb. 6, 2019), https://tobaccocontrol.bmj.com/content/early/2019/01/31/tobaccocontrol-2018-054796.

circuit board in the JUUL moderates the temperature of the coil to ensure the e-liquid is vaporized but not combusted. The resulting vapor is drawn into the user's mouth and lungs.

49.    The "smart" circuit board technology incorporated into the device to regulate temperature and vapor flow means there are no buttons, dials, or settings. The user need only click a JUULpod into place and then draw on the device. Reviewers have called the JUUL "insanely simple" to use and have applauded its "[e]ase of use" and the "stealthiness of the device." [13]

50.    The JUUL e-cigarette's only other built-in feature is a small LED light that indicates the device's battery level when tapped. Additionally, much like a toy, the LED flashes rainbow of colors when the device is waved around. This feature is known as JUUL's "party mode."

### III.    **JUUL Markets Its Products as an Alternative to Combustible Cigarettes Even Though JUUL's Products Are More Potent and Addictive and Designed to Appeal to Nonsmokers.**

51.    Beyond its aesthetic design, the JUUL was also functionally designed to attract and hook a new generation of users by delivering exceptionally high amounts of nicotine and very fast rates but with little to no throat irritation.

52.    According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[14] JUUL designed its product to provide the largest amount of nicotine in the fastest way possible. As JUUL itself advertises, the device delivers nicotine to the bloodstream as much as 2.7 faster than other e-cigarettes. And, because of JUUL's unique formula of nicotine salts and organic acids, JUUL delivers a vapor is extremely potent in terms of nicotine content but also considerably smoother than cigarettes or even other e-cigarettes.

---

[13] Drake Equation, *The JUUL Vape Explained: How It Works + Reviews of Device*, VAPEBEAT (Feb. 26, 2019), https://vapebeat.com/features/JUUL-vape-explained-works-reviews-device.

[14] CDC *et al.*, *Nicotine Addiction: Past and Present*, HOW TOBACCO SMOKE CAUSES DISEASE: THE BIOLOGY AND BEHAVIORAL BASIS FOR SMOKING-ATTRIBUTABLE DISEASE: A REPORT OF THE SURGEON GENERAL (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92.

53.     JUUL's patented process of combining benzoic acids with nicotine to produce nicotine salts to allow users to draw larger amounts of nicotine without the throat discomfort caused by untreated "free-base" nicotine draws on prior scientific research by R.J. Reynolds Tobacco Company ("RJR"). Decades ago, RJR developed and patented the use of nicotine salt additives, like nicotine benzoate, to its tobacco cigarettes to increase the amount of nicotine delivered in cigarette smoke. The addition of nicotine salts lowers the pH of the nicotine content and, in a 1973 RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive for young users.

54.     JUUL and its predecessor Pax Labs, Inc., built upon RJR's earlier research and developed and patented its own process for creating an e-liquid that avoided the use of free-base nicotine, which is commonly found in other e-cigarette companies' e-liquids but also the main cause throat irritation known as a "throat hit."

55.     JUUL's manipulation of nicotine pH directly affects the palatability of nicotine inhalation by reducing the "throat hit" users experience when vaping. Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form. A recent study found that JUUL's e-liquid had a pH of under 6.0, suggesting that the JUUL contains almost no freebase (i.e., non-salt form) nicotine.[15] Another study found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." [16] Indeed, the study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth."[17]

---

[15] J.H. Lauterbach, *One More Time: Unprotonated Nicotine in E-Cigarette Aerosols: Is It Really There?* (2018), https://www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf.
[16] *See* Anna K. Duell, James F. Pankow, and David H. Peyton, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 431 (2018).
[17] *Id.* at 433.

56.     JUUL's creation of a product with low levels of harshness and minimal "throat hit" is consistent with the goal of producing a product for non-smokers. The non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation. The design also shows that JUUL's intention was to recruit nonsmokers, not existing smokers, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix. Minimizing the throat "hit" of JUUL e-cigarettes is therefore unnecessary to providing an alternative for adult smokers but is crucial to luring a new generation of users.

57.     JUUL's lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine. The "throat hit" is part of the body's alert system, letting a person know he/she is inhaling something harmful. Reducing or removing this feedback impairs the user's ability to ascertain that he/she is consuming a toxin. As a result, the cravings for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction.

58.     JUUL sells products that contain relatively low amounts of throat-irritating freebase nicotine yet contain and deliver far higher concentrations of nicotine than cigarettes or other electronic nicotine delivery systems ("ENDS") containing freebase nicotine. Blood plasma studies in the JUUL patent documents show that vaping nicotine benzoate increases nicotine delivery compared to vaporized solutions of freebase nicotine. In fact, nicotine uptake was up to four times higher for nicotine salt formulations than traditional cigarettes (approximately 4 ng/mL/min compared to approximately 1 ng/mL/min).

59.     JUUL's patent documents show that a 4% solution of benzoic acid nicotine salt causes a peak nicotine-blood concentration ("Cmax") of approximately 15 ng/mL—almost 50% more than a Pall Mall cigarette, which is associated with an 11 ng/mL Cmax.

60.     But studies show that JUUL's nicotine salt solutions are even more concentrated than JUUL's patent documents claim. One study found that the benzoic acid concentration was not 4% but 4.5%, and the nicotine salt concentration was not 5% as JUUL claims, but rather 6.2% (over 20% more than claimed). Other studies have reported even higher actual concentrations of nicotine in JUULpods.

JUULpods containing higher nicotine and benzoic acid concentrations than JUUL claims will produce higher nicotine absorption than expected for the advertised formulation.

61.      In any event, JUUL is delivering doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[18] With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake, JUULpod use easily exceeds the nicotine dose of a traditional cigarette. As Israel's Deputy Health Minister has noted, "a product that contains a concentration of nicotine that is almost three times the level permitted in the European Union constitutes a danger to public health and justifies immediate and authoritative steps to prevent it from entering the Israeli market."[19]

62.      A comparison of available data regarding per puff nicotine intake corroborates the other studies described above and indicates that JUUL delivers about 30% to 40% more nicotine per puff than a combustible cigarette.

63.      Indeed, prior to JUUL's launch, most e-liquids on the market ranged from 1% to 3% nicotine concentration by volume, with 3% products being marketed as "super high" concentration and intended for two-packs per day smokers. JUUL entered with an e-liquid that was 5% nicotine by weight, or nearly 6% nicotine by volume. As a result, one study found, JUUL triggered a "nicotine arms

---

[18] *E-Cigarettes*, EUROPEAN COMMISSION: PUBLIC HEALTH, https://ec.europa.eu/health/sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (last visited Sep. 17, 2019).
[19] Ronny Linder Ganz, *JUUL Warns it Will Fight Israel Over Its Potential Ban on ECigarettes,* HAARETZ (June 3, 2018, 9:52 p.m.), https://www.haaretz.com/israel-news/business/JUUL-warns-itwill-fight-israel-over-potential-ban-on-its-e-cigarettes-1.6140058.

race" among e-cigarette and e-liquid purveyors seeking to compete by providing comparably high or higher doses.[20]

64.    Higher nicotine content directly correlates to higher rates of consumption of nicotine products, as well as stronger addiction symptoms. Meanwhile, JUUL's lower nicotine pH correlates with a reduced "throat hit" and thus increased ease of repeated or "chain" use. In other words, JUUL is designed to be more addictive and to achieve greater user consumption rates than combustible cigarettes or other e-cigarettes.

## IV.    JUUL Fraudulently Concealed Material Information about the Highly Addictive Nature of Its E-Cigarettes.

65.    Despite the above data, Defendant has failed to disclose to consumers that JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

66.    In fact, in many instances, JUUL failed to disclose in its marketing materials that JUULpods contain any nicotine at all.

67.    Despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings until forced to do so in August of 2018. The original JUUL product labels had a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, and a warning to keep JUULpods away from children and pets, but contained no warnings specifically about the known effects, or unknown long-term effects, of nicotine or vaping/inhaling nicotine salts. Many of JUUL's advertisements, particularly prior to November 2017, also lacked a nicotine warning.

68.    As a result of JUUL's misleading advertising and failure to warn about JUUL's high nicotine content and the damaging effects of nicotine, many youth users believe that JUUL sometimes contains no nicotine at all.

---

[20] Robert K. Jackler & Divya Ramamurthi, *Nicotine arms race: JUUL and the high-nicotine product market*, TOBACCO CONTROL (Feb. 2019).

69.    Adult smokers have similarly been misled into believing "switching" from combustible cigarettes to JUUL will reduce nicotine intake and addiction when, in reality, JUUL delivers more nicotine than cigarettes.

70.    In the cases where JUUL did describe its nicotine content, JUUL either did not disclose the amount of nicotine or advertised that its products delivered approximately 25% *less* nicotine to the blood than a cigarette, creating the false impression that a JUUL is less addictive than a combustible cigarette. JUUL's marketing directly contradicts its own patent application, which highlighted that JUUL's 4% benzoic acid concentration and 5% nicotine salt concentration cause nicotine-blood levels that are 30% *higher* than a combustible cigarette.

71.    In sum, Defendant has either misrepresented the pharmacokinetic effect of its products or altered the composition and, hence, pharmacokinetic effects of its products without disclosing that material fact to consumers. Because JUUL's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes. Thus, far from helping smokers quit, the JUULs simply increase their level of addiction to nicotine. Further, JUULpods are foreseeably exceptionally addictive—more so than combustible cigarettes—when used by persons without prior exposure to nicotine—another fact not disclosed by Defendant.

72.    JUUL has fraudulently concealed material information about the addictive nature of its e-cigarettes. Defendant necessarily is in possession of all of this information. Plaintiffs' claims arise out of Defendant's fraudulent concealment of material facts concerning the JUUL e-cigarette and Defendant's representations about the JUUL e-cigarettes' nicotine content, potency, benzoic acid content, and physiological effects of JUUL e-cigarettes.

73.    Plaintiffs allege that at all relevant times, including specifically at the time they purchased or used JUUL e-cigarettes, Defendant knew that JUUL e-cigarettes were not safe under any circumstances for non-smokers, and posed a risk of aggravating nicotine addiction in those already addicted to cigarettes. Defendant also knew that JUUL's nicotine solution could deliver more nicotine into the bloodstream than a cigarette and did so more quickly than a cigarette. Defendant was under a

duty to disclose this material information based upon its exclusive knowledge of it. Instead, Defendant concealed these facts and failed to disclose them to Plaintiffs or the public.

74.    Since launch and continuing to this day, wherever JUUL disclosed its nicotine content, JUUL's marketing has been rife with claims that a JUULpod's nicotine content is equivalent to one pack of cigarettes.[21] But those statements are false and misleading because, as JUUL knows, what matters is not the amount of nicotine in an unused product, but rather the amount of nicotine that is delivered when the product is used. The amount of nicotine delivered to the bloodstream determines the product's health effects and risk of addiction.

75.    What JUUL's claim of equivalency to a pack of cigarettes does not disclose is that most of the nicotine in a cigarette is never delivered to the user. Rather, a cigarette typically delivers about 1 mg of nicotine in smoke while retaining about 14-20 milligrams of nicotine in the unsmoked rod. This means only 5-7% of the nicotine in a cigarette is delivered to the user. In line with this expectation, a study of thousands of smokers found smokers intaking between 1.07 to 1.39 milligrams per cigarette, or 21.4-27.8 mg per pack of 20 cigarettes.

76.    JUUL e-cigarettes, unlike combustible cigarettes, deliver nicotine at a highly efficient rate of at least 82% the nicotine contained in a JUULpod. Assuming JUUL's reported nicotine concentration of 59 mg/mL, a 0.7 mL JUULpod contains 40mg of nicotine and would deliver at least 32.8 mg of nicotine—as much as 50% more than a pack of cigarettes.  These comparisons assume one of the lowest studied efficiency rates for a JUUL (82%) as well as JUUL's advertised nicotine concentration of 59 mg/mL (which studies have shown to be lower than the actual concentration). The actual amount of nicotine delivered by vaping a single JUULpod is likely even higher; at a deliver rate closer to 100%, a JUULpod would deliver as much nicotine as two full packs of combustible cigarettes.

---

[21] *See, e.g.*, *JUUL Savings Calculator*, JUUL.COM, https://www.JUUL.com/calculator (last visited Sep. 17, 2019) and Attachment C.

77.    JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is therefore literally false and likely to mislead, because the amount of nicotine *contained* in the JUULpod is perhaps six times less than in a pack of cigarettes, but actual amount of nicotine *consumed* via JUULpod is as much as twice as high as that via cigarettes.

## V.    JUUL Marketed Its Products to Youth Because JUUL Knew That Was the Best Way to Build a Strong Base of Addicted Users.

78.    JUUL's product design and marketing deliberately appealed to youth and young people because JUUL knew that hooking young people on JUUL's intentionally potent nicotine formulation would secure a captive consumer base.

79.    It is well known that nearly 90% of adult smokers started smoking cigarettes before age 18, and that 99% start by age 26. In fact, the United States Surgeon General's 2012 report on smoking and health stated that one of the most important and widely cited findings from the 1964 release of the same report was that cigarette smoking almost always begins before adulthood. The 2012 report corroborated that the finding still held true. This statistic stems from the fact that nicotine use is most likely to become a habit during teenage years. Adolescent brains are far more susceptible to addiction than adult brains. Further, teenagers are more likely than adults to acquire symptoms of nicotine dependence even before they start using nicotine products on a regular basis; some adolescents have reported nicotine dependence symptoms while using tobacco as little as 1-3 days per month. Accordingly, the younger you are when you begin to smoke, the more likely you are to become addicted to nicotine. Conversely, delaying the age when kids first experiment or begin using tobacco (1) reduces the risk that they transition to regular or daily tobacco use and (2) increases their chances of successfully quitting, if they do become regular users. In other words, introducing nicotine products to teenagers is the best way to ensure that they become and remain lifelong, daily users.

80.    Though no single-source causative factor can describe the complex link between marketing and youth smoking, the overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation." *United States v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006). Because

teenagers are at a stage in their psychosocial development when they are struggling to define their own identities, they are particularly vulnerable to image-heavy advertisements providing cues for the "right" way to look and behave amongst peers. *Id.* at 578. Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation. *Id.* at 570 & 590. By making smoking a signifier of a passage into adulthood, tobacco companies turned smoking into a way for teenagers to enhance their image in the eyes of their peers. *Id.* at 1072.

81.    The landmark *Philip Morris* case revealed that tobacco companies targeted adolescents for decades by: "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and themes in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion strategies to knowingly reach teenagers." No. 99-cv-2396, ECF 5732, ¶ 2682 (D.D.C. 2008). In terms of images and themes that cater to adolescents, the court found "overwhelming" evidence that tobacco companies intentionally exploited adolescents' vulnerability to imagery by creating advertising emphasizing themes of "independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being 'cool.'" *Id.* at ¶ 2674.

82.    With this understanding, JUUL used decades of research by the tobacco industry, health organizations, and anti-youth smoking advocacy organizations to develop its product design and marketing specifically to appeal to youth and young people.

**VI.    JUUL Used Flavors and Food Imagery to Attract Nonsmoking Adolescents and Adults.**

83.    One of the main ways that JUUL has attracted middle school and high school students to its products is by marketing and selling candy-like flavors. JUUL sells its JUULpods in a variety of sweetened flavors, which have included "cool" cucumber, "cool" mint, mango, fruit medley, and crème brulee. Many reviewers say JUUL's mint flavor tastes like a candy cane.

84.    The tobacco industry has long known that sweetened cigarettes attracted young smokers, and the FDA banned flavored cigarettes for that reason.

85.    JUUL's flavors have been especially effective in attracting underage users. JUUL introduced the two most popular flavors among youth—mango and cool mint—in 2017. The

introduction of these two flavors coincides with a huge increase in reported underage vaping, with a nearly 80% increase in teen vaping from 2017 to 2018.

86.    JUUL even advertised some of its flavors as though they were desserts in themselves. For example, it advertised its crème brulee flavor using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." JUUL also used imagery that looked like ads for a trendy coffee shop or restaurant. In one 2016 email, JUUL bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee." The advertisement harkens back to tobacco industry ads that pitched cigarettes as dieting tools and calorie-free indulgences that could stand in for decadent foods.

87.    Research also shows that when youth see flavored e-liquid advertisements, they believe the advertisements and products are intended for them.[22]

88.    JUUL's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUULpods as a delicious treat rather than a system for delivering a highly addictive drug, JUUL deceptively led consumers to the conclusion that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

89.    JUUL's product testing, design, and marketing of its candy-like flavors has catapulted flavors like Mango and Mint to dwarf sales of other JUULpod flavors. Through the fall of 2018, sales of Mango JUULpods brought in $887 million in annualized sales. Together with the Mint JUULpods, the two flavors accounted for 74.7% of all JUULpod sales ($1.6 billion in annualized sales) tracked by Nielsen.

90.    In November 2018, JUUL stopped taking store orders for Mango flavored JUULpods but continued to sell Mint JUULpods to retailers. Since then, sales of Mint JUULpods have overtaken

---

[22] See, e.g., K. McKelvey, et al., Youth say ads for flavored e-liquids are for them, 91 ADDICT BEHAV. 164 (Aug. 29 2018), https://www.ncbi.nlm.nih.gov/pubmed/30314868.

Mango—and all other flavors combined—with annualized sales of $2.36 billion. Mint JUULpods, alone, now account for 75% of JUUL's sales tracked by Nielsen.

## VII.    JUUL Promoted Its Products to Young People With Youth-Targeted Marketing.

91.    In addition to developing a sleek, high-tech, toy-like product design and candy-like flavors that appeal to youth, JUUL also directly targeted teenagers through its advertising and marketing campaigns. JUUL developed youthful advertising, *e.g.*, depicting young people enjoying JUUL at parties; contracted with young social media influencers to promote JUUL use among their followers; promoted JUUL at hip, youthful parties in major cities; and even directly engaged middle school and high school students to promote JUUL as a healthy and safe alternative to cigarette smoking.

### A.    *JUUL's Youth-Focused Advertising*

92.    In developing advertisements, JUUL turned to the successful advertisements previously employed by tobacco companies to attract 14- to 18-year-old users. JUUL's reliance on tobacco industry documents is apparent in a collection of 82 JUUL advertisements compared to historical cigarette advertisements on Stanford's Research into Impact of Tobacco Advertising ("SRITA") website. A side-by-side comparison of numerous JUUL advertisements shows that its imagery directly parallels that adopted by cigarette manufacturers, including imagery relating to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.

93.    Throughout the class period, JUUL ran an extensive, consistent, simple message on social media that communicated to people, and in particular, teenagers and young adults that JUUL's products were used by popular, attractive, and stylish young adults (*i.e.*, an idealized version of an adolescent's future self) while failing to adequately and conspicuously disclose the nature or risks of the products.

94.    In designing the campaign, JUUL knew that to increase the chances that content goes viral amongst the teen demographic, it needed to design a campaign that was simple, would generate an emotional response that would resonate with teenagers, and obscured the fact that the product was unsafe and addictive.

95.    To help it design these ads, JUUL relied on various social media marketing companies. In 2015, JUUL worked with Cult Collective, instructing Cult Collective to design an ad campaign that would catch fire and reach customers who had "heard it all before." At the time, JUUL was a young company, competing with big, established tobacco companies with large advertising budgets and high brand loyalty. The solution JUUL and Cult Collective reached was to position JUUL as a modern product that represented a better way of life for young people. That campaign was highly effective.

96.    To announce the JUUL's release in June 2015, JUUL launched the "Vaporized" advertising campaign that was aimed at a youth audience. The campaign used young, stylish models, bold colors, and memorable imagery. The models were often using hand gestures or poses that mimicked underaged teenagers. JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products.

97.    The extensive Vaporized campaign advertisements featured young, stylish models and images of attendees at JUUL's launch parties and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool." In other words, the Vaporized campaign targeted youth using the exact template established by the tobacco industry decades earlier.

98.    JUUL's Vaporized ads notably failed to include any visible or prominent disclaimers about the dangers of nicotine described above. As the Cult Collective creative director explained, "We created ridiculous enthusiasm for the hashtag 'Vaporized,' and deployed rich experiential activations and a brand sponsorship strategy that aligned perfectly with those we knew would be our best customers."

99.    To ensure that its message would spread, JUUL utilized several other tools to put its product in front of young people. First, it ran the Vaporized campaign in the front spread of Vice magazine's cover issue. Notably, Vice bills itself as the "#1 youth media brand" in the world and is known for running edgy content that appeal to youth.

100.    JUUL's chief marketing officer, Richard Mumby said "while other campaigns tend to be 'overtly reliant on just the product,' [JUUL's] effort features diverse 20-to-30-year-olds using the product."[23] This reliance on images of young, diverse users was specifically aimed at convincing young people who were not previously cigarette smokers to purchase JUUL products, to make the use of JUUL appear fun and without long-term negative consequences, to position the JUUL e-cigarette as the e-cigarette of choice for young adults, and to introduce youth to the "illicit pleasure" of using the JUUL products.

101.    To the extent that the Vaporized advertisements disclosed that JUUL products contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, advertisements for combustible cigarettes must display a health warning in high contrast black and white in a box comprising 30% of the image.

102.    JUUL also marketed its products as a cool status symbol for youth. For instance, JUUL consistently compared the JUUL to the iPhone through statements like "the iPhone of e-cigarettes," which JUUL posted on its website, distributed through social media, and disseminated through its email campaign. The iPhone is the most popular smartphone among adolescents, with 82% of teenagers preferring Apple's phone over the competition. JUUL's advertising images frequently include pictures of iPhones and other Apple devices, including iPads, Beats Headphones, MacBook laptops. Through these images, JUUL presented its image a "must have" technology product and status symbol, instead of a nicotine delivery system.

**B.    *JUUL's Social Media Campaign***

103.    JUUL promoted the Vaporized campaign and other product advertising on social media apps such as Facebook, Instagram, and Twitter. The Vaporized campaign was the largest smartphone

---

[23] Declan Harty, *JUUL Hopes to Reinvent Cigarette Ads with 'Vaporized' Campaign*, ADAGE (June 23, 2015), https://adage.com/article/cmo-strategy/JUUL-hopesreinvent-e-cigarette-ads-campaign/299142/.

campaign for any e-cigarette in 2015, accounting for 74% of all e-cigarette smartphone advertising that year.

104.     Instagram, in particular, is a youth dominated platform. At least 72% of teenagers in the United States have an Instagram account, and at least 63% of teenagers between the ages of 13 and 17 use Instagram every day.

105.     Beyond serving their own advertisements and creating hashtags to allow users to easily engage with other young users or "JUULers" on social media, JUUL also paid social media "influencers" or "high-social net worth" individuals with large social media followings to promote JUUL.

106.     JUUL was able to harness social media and the popularity of certain widely followed users known as "influencers" to advertise its products to young people. Marketers pay influencers to use or pose with products in much the same way that they pay for product placement in movies and TV. Most influencers are active on Instagram.

107.     JUUL targeted coveted influencer engagement with its products since its launch and at least through December 2018, when JUUL's website still called for individuals to sign up to "Join the JUUL influencers." Internal documents show that JUUL's influencer program plans included getting the device "into the hands" of 12,500 influencers to be able to "introduce[e] JUUL to over 1.5M people."

108.     Many of JUUL's own posts of apparently user-generated content and many of the posts paid influencers made to their own accounts failed to disclose the commercial relationship between JUUL and the models or influencers depicted. By presenting JUUL advertisements featuring compensated models as unsolicited "#JUULmoment" posts, JUUL led its target audience to believe that JUUL use was more widely used than it was, that attractive, popular people used JUUL, and that these same attractive, popular people endorsed creating and posting JUUL-related social media content on Instagram and other platforms. JUUL also led consumers to believe these endorsements were unsolicited, when they were in fact bought and paid for. To the extent that JUUL's affiliates and

influencers disclosed that they were being paid, JUUL subverted these disclosures by reposting the images to JUUL's timeline without disclosing that the image was from a paid advertiser.

109.    JUUL also took advantage of the way that social media apps like Facebook and Instagram display posts on mobile phones—the primary mode of adolescent's social media consumption. Facebook and Instagram typically only present to users the image and a couple lines of text, and viewers who want to see the entire post must click on it to open it up and read the rest. To the extent JUUL included any nicotine warnings in its social media advertisements, JUUL obscured the warnings by placing them in a location that requires the user to click to read the entire post, instead of continuing to scroll through other images. JUUL consistently used brief text at the beginning of a post so that it would appear to be a complete sentence with no further content, so users were unlikely to click to read more.

110.    In addition, JUUL used viral marketing techniques to turn users—often underage users—into free JUUL promoters. JUUL accepted the benefits of these user and third-party promotions, even where they clearly targeted youth and/or depicted underage JUUL use.

111.    For example, JUUL created hashtags to encourage JUUL users to create and share their own videos and images associated with using JUUL. A former JUUL executive reportedly told the New York Times that, within months of launching its products in 2015, JUUL "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."

112.    As JUUL continued to promote its products on social media, several popular JUUL-tribute YouTube and Instagram accounts proliferated. Many of these accounts were created by distributors or retailers of JUUL and other vaping products, such as Eon Smoke.

113.    One especially popular viral third-party account and hashtag, #doit4JUUL and @doit4JUUL, encouraged followers to post videos depicting their JUUL use. Many of the #doit4JUUL posts depicted young teens using JUUL at home and at school, including surreptitiously in front of parents or teachers. The @doit4JUUL account had more followers than JUUL's official Instagram account.

114.    Another popular third-party account and hashtag was @JUULnation or #JUULnation. @JUULnation posted tips on Instagram for how to conceal JUUL devices in school supplies and how to use JUUL clandestinely in different places, including classrooms. The account also promoted videos glorifying drug abuse, such as the JUUL Challenge, in which individuals inhale as much JUUL nicotine vapor as possible in a fixed period of time. The @JUULnation account also promoted the traffic and sale of JUULpods through Instagram.

115.    These third-party promotional accounts and hashtags included JUUL's tradename. JUUL had the ability to shut down unauthorized uses of the JUUL tradename, particularly to promote underage use of JUUL products. Instead of putting an end to these youth-targeted accounts, JUUL often promoted them. For instance, JUUL's official Instagram repeated promoted the #JUULnation hashtag.

116.    Much of JUUL's use of the #JUULnation hashtag occurred just days before JUUL announced that it would increase the age to purchase JUUL products on its website to 21. By directly promoting an account known to offer youth-focused marketing and to facilitate user to user sales of JUULpods, JUUL effectively handed over its youth-marketing division to third party accounts like @JUULnation.

117.    @JUULnation and @Doit4JUUL have finally been shut down. But their youth-focused JUUL content lives on and continues to grow through the use of the viral hashtags associated with the accounts.

## C.    *JUUL's Promotional Emails Indiscriminately Promoted JUUL Regardless of Age Verification*

118.    Between 2015 and 2018, JUUL sent around 200 email promotions to customers and potential customers. JUUL's email subscription list was not age-restricted and, until recently, users who failed the age verification requirements on JUUL's purchase page were nevertheless added to JUUL's mailing list and emailed a coupon for a discount on a Starter Kit. The JUUL emails promoted retail locations, flavors, discounts, and "refer a smoker" programs. The emails also promoted JUUL's find-a-store locator.

**D.**     *JUUL's Promotional Parties and Sampler Events Hooked Young New Users with Free Starter Kits*

119.    JUUL also sponsored at least 25 live social events for its products in California, Florida, New York and Nevada between June and December 2015. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine or was addictive. Instead, the invitations advertised live music or slumber parties as well as giveaways of "free #JUUL starter kit[s]." Photographs from these events indicate that they drew a youthful crowd. Use of sponsored events was a long-standing practice for tobacco companies but is now forbidden.

120.    To hook new users, JUUL gave away an average of 5,000 plus JUUL "Starter Kits" at the live social events. Each Starter Kit contains four JUULpods of varying flavors. Based on the estimated average number of Starter Kits given out for free at JUUL's 25 live events, JUUL distributed the equivalent of as many as 1,000,000 packs of cigarettes at its promotional events. Though JUUL publicly acknowledged in October 2017 that it is unlawful to distribute free samples of its products at live events under federal regulations,  JUUL continued to do so, sometimes through $1 "demo events."

121.    The effect—and purpose—of JUUL's Vaporized giveaways was to flood major cities with free product which by its addictive nature would hook tens or hundreds of thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JUUL's message to their friends via word of mouth and social media. As a foreseeable result, JUUL products ended up in the hands of non-smokers and youth, who used the products and became addicted to nicotine.

**E.**     *JUUL's Brick-and-Mortar Store Sales Targeted Youth*

122.    For years, JUUL made it difficult for smoke shops, vape shops and other age-restricted stores to carry its products, instead directing all of its product to gas stations, which historically are the worst offenders with respect to underage sales. JUUL knows that teenagers, those new to smoking, and those trying to quit their nicotine addiction are likely to frequent gas stations and convenience stores

rather than smoke shops. By distributing in those kinds of stores, JUUL increased the likelihood that these people would purchase the product.

123.    By restricting sales in smoke shops and other age-restricted shops, JUUL deliberately avoided sales to older crowds. Doing so helped JUUL create and maintain the youthful cool image portrayed in its early marketing campaigns.

124.    To further drive curiosity and interest, and make it so its target audience, and especially teenagers, would purchase JUUL, JUUL instructed retailers to display the product in an unusual fashion. Whereas cigarettes and other tobacco products have long been kept behind the counter, JUUL designed display cases that would sit on store shelves. JUUL knew that by asking retailers to display JUUL products separate from other tobacco products, and within arms' reach, it would also suggest to consumers that JUUL was more safe than traditional cigarettes and that it was not an addictive drug.

125.    JUUL's in-store advertisements and displays, like its online advertising, failed to warn consumers of the nicotine content and dangers associated with use of JUUL's products.

126.    Moreover, it appears JUUL may have prioritized distributing and marketing its products at retail locations in close proximity to high schools and colleges.

### F.    *JUUL Invested in Direct Interactions with Middle School and High School Students*

127.    JUUL spent hundreds of thousands of dollars on a program targeted at directly engaging with children. In developing and implementing the program, JUUL was aware of direct parallels to tobacco industry attempts to directly engage with children. One internal JUUL memo highlighted that program components "seem to duplicate those of big tobacco." Another chart that was circulated internally at JUUL in the spring of 2018 directly compares components of JUUL's youth outreach program to techniques deployed by the tobacco industry.

128.    Direct tobacco company interactions with youth, even under the guise of providing information about the risks of smoking, have been shown to be an effective way to market to youth by introducing them to the products and increasing their interest in tobacco products. JUUL's direct interactions with youth were especially problematic because JUUL focused on the dangers of smoking

while highlighting the relative safety and health **_benefits_** of JUULing. Direct interactions with youth also provide tobacco companies, including JUUL, with valuable insights into youth interests and psychology that companies can then exploit in future marketing.

129.    In one instance, JUUL paid $134,000 to sponsor a 5-week "holistic health education" camp for Baltimore charter school students in grades 3 through 12. The draft agreement between JUUL and the charter school included provisions that would provide JUUL with data on students, including test scores from assessments of their "general health knowledge" and "risky behaviors."

130.    In another case, JUUL paid a school district $10,000 to implement an anti-tobacco curriculum that JUUL provided. Under the agreement, JUUL had the right to send representatives to the classes.

131.    JUUL even coopted a youth tobacco prevention toolkit developed by Stanford University for its own business purposes. JUUL presented some of Stanford's slides and talking points regarding cigarette use—but not the slides warning about e-cigarette use—to youth in middle and high schools, often without the presence of teachers.

132.    JUUL also offered to pay schools up to $20,000 to access classrooms of middle school and high school students, purportedly to educate students about tobacco addiction and prevention. JUUL's classroom presentations—which often occurred outside of the presence of teachers to give students a "safe space" to talk about nicotine use—emphasized the safety and relative health benefits of e-cigarette use compared to smoking. In one ninth grade classroom, a JUUL representative delivered a presentation that repeatedly claimed JUUL use was "totally safe." Such a claim is patently false.

**VIII.    JUUL Is Not a Safe or Healthy Product For Anyone and Particularly Not for Youth and Young People.**

133.    Although e-cigarette use avoids many of the dangers of cigarette smoking that derive from combustion and smoke inhalation, e-cigarette use is not "totally safe," or even just safe, particularly not for youth.

134.    Before JUUL launched, it was already clear that e-cigarette aerosols posed many health risks. For example, the 2014 Surgeon General's report included a chapter that addressed the numerous

adverse consequences of nicotine other than addiction. The report specifically outlined the evidence that suggested that nicotine exposure during adolescence, a critical window for brain development, may have lasting adverse consequences for brain development. In 2007, brain imaging studies of adolescents who began smoking at a young age showed markedly reduced activity in the prefrontal cortex of the brain, an area critical for a person's cognitive behavior and decision making, leading to increased sensitivity to other drugs and greater impulsivity. Other studies implicated nicotine—not other cigarette ingredients—as the main culprit.

135.    As such, the Surgeon General and Centers for Disease Control have made clear that any form and any amount of nicotine is unsafe and unhealthy for anyone under age 26.

136.    Moreover, recent reports have indicated that daily e-cigarette use increases a person's chance of having a heart attack by nearly two times compared to a nonsmoker. Further, because most daily users of e-cigarettes are more likely to start smoking combustible cigarettes in addition to using e-cigarettes, users may be increasing their risks of heart attack by as much as five times.[24]

137.    In addition, studies have highlighted the dangers of e-cigarette use associated with other ingredients and components of the inhaled vapor besides nicotine.

138.    For example, researchers have found that exposure to nicotine-free e-cigarette aerosols immediately inhibit normal function of blood vessels in ways similar to exposure to cigarette smoke or secondhand cigarette smoke.[25]

139.    A 2019 study led by a researcher at Yale University's Department of Chemical and Environmental Engineering determined that the vapor drawn from a JUUL contains many more ingredients than the listed ingredients for various flavors of JUULpods. The researchers determine that

---

[24] Stanton A. Glantz, *Smoking E-Cigarettes Daily Doubles Risk of Heart Attacks,* UCSF CENTER FOR TOBACCO CONTROL RESEARCH & EDUCATION (Feb. 24, 2018), https://tobacco.ucsf.edu/first-evidence-long-term-health-damage-ecigs-smoking-e-cigarettes-daily-doubles-risk-heart-attacks.
[25] Alessandra Caporale, *et al.*, *Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI,* RADIOLOGY (Aug. 20, 2019), https://pubs.rsna.org/doi/10.1148/radiol.2019190562.

the e-liquid ingredients react to form unlisted chemicals, even before vaporization. In particular, the Yale study found that the e-liquids in JUULpods and the vapor inhaled from a JUUL includes several acetals, which are chemicals that form when the common flavorant vanillin interacts with the alcohols that carry the nicotine and flavors in e-cigarettes. Acetals are known to cause inflammation and irritate users' airways.[26] The researchers found that vanillin acetals in JUUL vapor were near the maximum workplace safety limits for workplaces where vanillin is used, such as in bakeries and the flavor chemical industry.

140.    In addition, one of JUUL's primary innovations—the use of large amounts of benzoic acid—contributes to additional adverse health effects. JUULpods contain a very high amount of benzoic acid (44.8 mg/mL) to reduce the harshness of JUUL's nicotine hit and allow larger doses of nicotine to be delivered, even to novice, nonsmoker users. By comparison, other e-cigarette brands contain just 0.2 to 2 mg/mL of benzoic acid. According to the Center for Disease Control and Prevention (CDC), benzoic acid is known to cause coughs, sore throat, abdominal pain, nausea, and vomiting if exposure is constant, which is the case when using a JUUL.

141.    The nichrome (nickel and chromium) heating coil in JUULpods also presents a danger to users' health. Studies have shown that significant amounts of toxic heavy metals including, lead, chromium, nickel, and manganese leach from heating coils and make their way into the aerosols that users breathe in. All of these metals are toxic when inhaled. Research has also shown that heavy metal levels in aerosols are higher for e-cigarettes—like JUUL—where coils are more frequently changed. The research suggests that fresher coils give off metals more readily.[27] Whereas in many other e-cigarettes, the coil is part of the e-cigarette and is not regularly changed, the JUUL is designed to use a new coil

---

[26] Hanno C. Erythropel, *et al.*, *Flavorant-Solvent Reaction Products and Menthol in JUUL E-Cigarettes and Aerosol*, 57:3 AMERICAN JOURNAL OF PREVENTIVE MEDICINE 425 (2019), https://www.ajpmonline.org/article/S0749-3797(19)30187-4/pdf.
[27] *Study: Lead and other toxic metals found in e-cigarette 'vapors,'* AMERICAN ASSOCIATION FOR THE ADVANCEMENT OF SCIENCE: EUREAK ALERT (Feb. 21, 2018), https://www.eurekalert.org/pub_releases/2018-02/jhub-sla022118.php.

with each JUULpod. JUUL users can therefore be exposed to a source of toxic heavy metals on a daily basis.

142.     E-cigarette use also exposes users to high levels of ultrafine particles and other toxins that have been linked to increased cardiovascular and non-cancer lung disease risks, which account for more than half of all smoking-caused deaths.

143.     The CDC is presently investigating several cases of severe lung illness associated with e-cigarette use, primarily among adolescents and young adults.[28] Nearly 100 cases of severe lung illness associated with vaping were reported from June 28, 2019, to August 15, 2019. In at least one case, the reported illness was fatal.

144.     The FDA is also currently investigating the link between e-cigarette use and seizures and other neurological symptoms after receiving several reports of young people suffering seizures after using JUUL.[29]

## IX.    JUUL's Marketing of Its Products as "Safe" or "Safer" Alternative to Cigarettes Is Unsupported and Misleading.

145.     In September 2019, the FDA sent a warning letter to JUUL concerning misleading health claims JUUL has made regarding its products.[30]  In that letter, the FDA noted that JUUL's advertising suggests, without scientific basis, "that using JUUL products poses less risk or is less harmful than cigarettes."

---

[28] CDC, *CDC, states investigating severe pulmonary disease among people who use e-cigarettes*, (Aug. 17, 2019), https://www.cdc.gov/media/releases/2019/s0817-pulmonary-disease-ecigarettes.html.
[29] *See* Anna Edney & William Turton, *JUUL Devices Cited in Seizure Reports That Started FDA Probe*, BLOOMBERG (Aug. 29, 2019), https://www.bloomberg.com/news/articles/2019-08-29/JUUL-devices-cited-in-seizure-reports-that-triggered-fda-probe.
[30] *See* Warning Letter: JUUL Labs, Inc., (FDA Center for Tobacco Products Sep. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/JUUL-labs-inc-590950-09092019.

146.    In its letter, the FDA highlighted several statements JUUL made in presentations directly to high school students, including that JUUL "was much safer than cigarettes;" that JUUL was "totally safe;" that JUUL was a "safer alternative than smoking cigarettes;" and that the "FDA was about to come out and say [JUUL] was 99% safer than cigarettes."[31]

147.    From these and other advertising statements, the FDA concluded that "JUUL's labeling, advertising, and/or other actions directed to consumers (examples of which are referenced above), represent, or would be reasonably expected to result in consumers believing, that the products present a lower risk of tobacco-related disease or are less harmful than one or more other commercially marketed tobacco products; contain a reduced level of a substance or present a reduced exposure to a substance; and/or do not contain or are free of a substance or substances."

148.    Dr. Ned Sharpless, acting FDA commissioner, noted that JUUL made statements to our nation's youth in schools suggesting its products were less risky or less harmful than traditional cigarettes.[32]

## X.    As a Result of JUUL's Deceptive Advertising and Youth-Focused Marketing, JUUL Has Hooked a Huge Number of New Users, Particularly Youth.

149.    As a result of JUUL's aggressive advertising to teenagers, there is a new epidemic of teen addiction. Vaping has skyrocketed among middle school and high school students in the last two years. With JUUL holding approximately two thirds of the e-cigarette market and aggressively marketing to youth and young people, it's likely that millions of those teenagers are using JUUL.

150.    Use of JUUL is rising exponentially, in line with the way in which its social media presence has grown. A 2018 study found that approximately 21 percent of high school seniors had engaged in nicotine vaping at least once in a 30-day period, an enormous rise over the survey's 2017

---

[31] *Id.*

[32] Sheila Kaplan & Matt Richtel, *JUUL Illegally Marketed E-Cigarettes, F.D.A. Says*, NEW YORK TIMES (Sep. 11, 2019), https://www.nytimes.com/2019/09/09/health/vaping-JUUL-e-cigarettes-fda.html?action=click&module=News&pgtype=Homepage.

results, which found just 11 percent had.[33] That spike was the largest spike for any substance recorded by the study in 44 years.[34]

151.    Even more troubling are the challenges associated with getting kids to quit JUUL once they start. JUUL's aggressive social media campaign puts JUUL advertisements before them every day, all day. Those trying to stop thinking about it are faced with advertising when engaging in their regular activities. And even while JUUL has purportedly stopped advertising on social media in recent months, its hashtags, imagery, and impact live on, as there remain nearly 600,000 posts and counting on Instagram featuring the #JUUL hashtag as of September 17, 2019—approximately twice the number of #JUUL posts that remained on Instagram as of December 2018. Moreover, many medications for breaking nicotine addictions are approved only for adults.

152.    The teen vaping epidemic was by design, not by accident.

153.    When JUUL was first developed, the FDA's regulations on tobacco products were vague as to whether they applied to vaping devices. Because the regulations did not explicitly identify electronic vaping devices that dispensed tobacco and nicotine as a regulated product, JUUL interpreted those regulations to mean that it could sell its dangerous products to anyone, regardless of their age, and that it did not have to comply with the advertising and labeling restrictions that restricted other tobacco companies.

154.    JUUL no doubt knew that this gray area was unlikely to stay gray for long. Knowing that the clock was ticking, JUUL worked hard to get as many young people addicted as possible while it still viewed itself as "unregulated." The aggressive advertising described above was designed not just to sell the products to teenagers, but to sell the product to as many teenagers as possible while it still had a

---

[33] *Teens using vaping devices in record numbers*, NATIONAL INSTITUTE ON DRUG ABUSE (Dec. 17, 2018), https://www.drugabuse.gov/news-events/news-releases/2018/12/teens-using-vaping-devices-in-record-numbers.

[34] Lloyd D. Johnston, *et al.*, *2018 Overview: Key Findings on Adolescent Drug Use*, MONITORING THE FUTURE: NATIONAL SURVEY RESULTS ON DRUG USE 1975-2018, (2019), at 43, http://www.monitoringthefuture.org//pubs/monographs/mtf-overview2018.pdf.

plausible defense to any assertion that it was violating FDA regulations. By hooking teens, JUUL not only ensured it would have loyal consumers for decades, but those teens would influence their friends.

155.    Moreover, by pumping social media platforms full of images of cool, young people having fun while JUULing, JUUL ensured that everyone from adults to young children, would view JUULing as a cool, fun, and safe activity. Just as RJR Reynolds learned with Joe Camel, even very young children would in turn be more likely to form strong, positive associations with the tobacco product and be more susceptible to trying it in the future.

156.    Indeed, a December 2018 deal between JUUL and Altria, the parent company of Philip Morris, evidences JUUL's long-term strategy behind targeting youth who would not have otherwise used tobacco products. In the deal, Altria took a 35% share in JUUL. The deal is likely to benefit both companies, since JUULing and smoking go hand in hand. Youth who start using JUUL are many times more likely to start regularly smoking cigarettes than their peers. And adult smokers who start using JUUL are more likely to continue smoking cigarettes while also using JUUL—exposing them to higher concentrations of nicotine and reinforcing addiction instead of lessening it.[35]

157.    The deal is also beneficial to the two companies based on shared marketing efficiencies. Altria now has access to JUUL's years of social media metrics and youth survey responses— information Altria would not have been able to acquire for its combustible tobacco products under the Master Settlement Agreement. Analysts have also considered the potential for JUUL to include JUUL marketing and coupons in Altria's cigarette packs. Since smokers who start using JUUL are unlikely to

---

[35] *See, e.g.*, Scott Weaver, *et al.*, *Are electronic nicotine delivery systems helping cigarette smokers quit?*, PLOS ONE (July 9, 2018), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0198047, ("The adjusted odds of quitting smoking were lower for those that used ENDS at baseline (9.4%, 95% CI = 5.22%-16.38%; AOR = 0.30, 95% CI = 0.13–0.72) compared to smokers who did not use at ENDS (18.9%, 95% CI = 14.24%-24.68%.")); *see also What is the JUUL?*, DANA-FARBER CANCER INSTITUTE: INSIGHT (Aug. 7, 2019), https://blog.dana-farber.org/insight/2019/08/what-is-JUUL/, ("Research shows that not only do most e-cigarette users continue to smoke traditional cigarettes, but that e-cigarette use can actually make young people more likely to take up smoking." (citing American Lung Association)).

quit smoking, and are more likely to entrench addiction to nicotine, the deceptive "switch to JUUL" campaign could actually be beneficial to Altria's combustibles business.

158.     JUUL's JUULpod subscription and auto-ship feature further facilitates long-term addiction. In addition, JUUL misleadingly advertises its subscription service by stating that consumers can "cancel anytime," without disclosing how addiction to using JUUL or nicotine products would interfere with a user's ability to stop the subscription.  Defendant, in fact, knows (and preys upon the fact) that once a consumer begins using JUUL products, they will become addicted to those products and continue to purchase them, often in increasing amounts in order to achieve the same "high" as their tolerance to nicotine increases.

## CLASS ALLEGATIONS

159.     Plaintiffs bring this action against Defendant on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed **Class** is defined as follows:

> All persons who purchased, in the United States, a JUUL e-cigarette and/or JUULpods for personal or household consumption.

160.     Plaintiffs further propose the following **Youth Subclass**:

> All class members who at the time of at least one purchase were under the age of 18.

161.     Plaintiffs further propose the following **Florida Subclass**, defined as:
> All class members who are Florida residents and/or purchased JUUL e-cigarettes and/or JUULpods in Florida.

162.     Plaintiffs further propose the following **Georgia Subclass**, defined as:
> All class members who are Georgia residents and/or purchased JUUL e-cigarettes and/or JUULpods in Georgia.

163.     Excluded from the Class and Subclasses are Defendant and any of its affiliates, parents or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

164.     Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

165.    This action has been brought and may properly be maintained as a class action against the Defendant pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

166.    Plaintiffs do not know the exact size of the Classes and the Subclasses, but they are each composed of more than 500 persons. The persons in the Class and each Subclass are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

167.    This action involves common questions of law and fact to the potential Class and Subclasses because each Class Member's claim derives from the false, deceptive, unlawful and/or unfair statements and omissions that led Class Members to believe that: (a) JUUL E-cigarettes and JUULpods were less addictive than traditional cigarettes; (b) JUUL products could be used without negative health consequences, and (c) they would be able to stop using and purchasing JUUL products "anytime." Class Member claims also derive from common questions of law and fact related to JUUL products falsely advertised as non-addictive. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each Class Member to recover. Among the questions of law and fact common to the class are:

        a.   Whether Defendant's advertising and marketing regarding the JUUL E-cigarette and JUULpods were likely to deceive Class Members or were unfair;

        b.   Whether Defendant intentionally omitted material information from its advertising and marketing materials;

        c.   Whether JUUL intentionally targeted the Youth Subclass with its marketing;

        d.   Whether Defendant unfairly, unlawfully and/or deceptively induced Class Members to purchase JUUL E-cigarettes and/or JUULpods using the promise that they would be able to stop purchasing JUULpods "anytime";

        e.   Whether JUUL had a duty to warn of the risks its products pose; and

        f.   Whether Defendant breached its duty to warn of the risks its e-cigarettes pose.

**CAUSES OF ACTION**

I.    **COUNT I: Violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* (on behalf of the Class)**

168.    Plaintiffs reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully stated herein.

169.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq. ("CLRA") is a comprehensive statutory scheme that prohibits deceptive practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

170.    JUUL is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

171.    Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

172.    Application of California law is appropriate for this Class because Defendant JUUL is based in San Francisco, California. Defendant designed and implemented the unlawful and deceptive conduct described in this Complaint from its headquarters in the San Francisco Bay Area. Additionally, Defendant has more JUUL e-cigarette consumers in California than in any other state. Accordingly, the state of California has a special interest in regulating the misconduct of corporations like JUUL who work from and do business in the state.

173.    Defendant sold JUUL e-cigarettes and JUULpod nicotine cartridges to Plaintiffs and the Class. These items constitute "goods" within the meaning of the CLRA, Cal. Civ. Code § 1761(a). Further, Defendant sold auto-ship subscriptions for delivery of JUULpods. The subscriptions constitute "services" within the meaning of the CLRA, Cal. Civ. Code § 1761(b).

174.    JUUL's sales of goods and services to Plaintiffs and Class Members constitute "transactions" which were "intended to result or which result[ed]" in the sale of goods and/or services to consumers within the meaning of the CLRA, Cal. Civ. Code § 1761(e).

175.    Defendant's actions, representations and conduct have violated, and continue to violate the CLRA.

176.    From its headquarters in California, JUUL has violated the CLRA by in unlawful, unfair and deceptive practices as defined in Civil Code § 1770 with respect to the products and services provided to Plaintiffs and the Class, including but not limited to the following:

177.    Plaintiff, and those similarly situated, relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would have acted differently by not purchasing a JUUL E-cigarette and JUULpods.

178.    In addition to the specific JUUL advertising described above, Plaintiffs were exposed to JUUL's deceptive advertising message as a result of JUUL's adaptation of the tobacco industry's long-standing and extensive deceptive advertising campaign to a pervasive viral marketing campaign delivered via social media and email. From the introduction of the JUUL e-cigarette through at least 2018, JUUL used social media to inundate consumers with ads that—like those of the tobacco industry with respect to cigarettes—characterized JUUL e-cigarettes and JUULpods as a hip, stylish, fun activity that made one cool, rather than a means of delivering a highly addictive substance with long-term health effects.

179.    Plaintiffs each saw multiple advertisements in JUUL's long, pervasive advertising campaign and were exposed to the false messages conveyed by the campaign (*i.e.*, that JUUL was less— or at least no more—addictive than traditional cigarettes; that JUUL e-cigarettes and JUULpods were a healthy, hip, fun activity, not a means of delivering extremely potent and addictive doses of nicotine). JUUL's campaign lasted approximately three years and was pervasive on social media. This was a "longstanding" campaign, particularly when compared with the lifespan of the target audience—teens. Because of the length and pervasiveness of the campaign, it is not reasonable for each Plaintiff to identify in this Complaint every ad seen. Although the individual advertisements within JUUL's campaign vary in their details, groups of them share common elements such as their use of young, attractive models to convey the idea that JUUL would make one hip and attractive; use of active, healthy individuals to convey the idea that using JUUL was not unhealthy; and depiction of JUUL nicotine salt solutions as a flavorful "treat" rather than an addictive substance with long-term health

effects. Plaintiffs were exposed to JUUL's campaign and its messaging prior to purchasing JUUL e-cigarettes and JUULpods. Plaintiff Smith continues to be exposed to JUUL advertising, including while she has tried to quit JUULing.

180.    Defendant's practices, acts, policies and course of conduct violated California's state law prohibitions on deceptive practices. Over the course of JUUL's longstanding and extensive deceptive marketing campaign, JUUL violated the CLRA in many ways, including by:

    a.    representing through public statements, marketing, advertising, via social media, and on JUUL's website (among other places) that its products were safe and/or not harmful, when in fact its products were unsafe for persons under age 26.

    b.    representing that each JUUL pod contained approximately the same amount of nicotine as one pack of cigarettes, when in fact it delivered much more than that;

    c.    representing that it had developed JUUL products only as an alternative for adult cigarette smokers, when in fact it designed and marketed JUUL's products to young people to create and sustain addiction so as to build customers for life; and

    d.    concealing material facts from Plaintiffs, including that JUUL is highly addictive, significantly increases blood pressure, causes repeated exposure to toxic chemicals, causes vascular damage, causes strokes, heart attacks and other cardiovascular risks, and causes permanent brain changes, mood disorders and learning and cognitive impairments.

181.    Defendant's acts violated the CLRA, including its prohibitions against:

    a.    Omitting, concealing, and suppressing material facts in the labeling and advertising of its goods and services;

    b.    Misrepresenting the sources, sponsorship, approval, endorsement or certification of goods or services, Cal. Civ. Code § 1770(a)(2);

    c.    Misrepresenting the affiliation, connection, or association with, or certification by, another for its goods or services, Cal. Civ. Code § 1770(a)(3);

d.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have, Cal. Civ. Code § 1770(a)(5);

e.   Misrepresenting that the goods or services that they sell are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not, Cal. Civ. Code § 1770(a)(7);

f.   Advertising goods or services with intent not to sell them as advertised, Cal. Civ. Code § 1770(a)(9);

g.   Making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions, Cal. Civ. Code § 1770(a)(13);

h.   Misrepresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not, Cal. Civ. Code § 1770(a)(16); and

i.   Engaging in unconscionable conduct, Cal. Civ. Code § 1770(a)(19);

182.   As a proximate result of the above-described deceptive acts, Plaintiffs and members of the Class and Youth subclass: (a) purchased and used JUUL nicotine products when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchase of JUUL nicotine products; (c) suffered and/or will suffer additional economic losses in purchasing JUUL nicotine products to maintain their addiction; and (d) suffered and will suffer additional economic losses incidental to their addiction.

183.   Until the present, Defendant has knowingly accepted the benefits of its deceptive conduct in the form of profits from the sale of JUUL E-cigarettes and JUULpod nicotine cartridges.

184.   Plaintiffs, individually and on behalf of the Class, seek an order enjoining the acts and practices described above, attorneys' fees, and costs under the CLRA.

## II.    COUNT II: False Advertising in Violation of California Bus. And Prof. Code §§17500, et. seq. (on behalf of the Class)

185.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

186.    Pursuant to Cal. Bus. & Prof. Code §§ 17500, et seq., it is "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

187.    Application of California law is appropriate for this Class because Defendant JUUL is based in San Francisco, California. Defendant designed and implemented the unlawful and deceptive conduct described in this Complaint from its headquarters in the San Francisco Bay Area. Additionally, Defendant has more JUUL e-cigarette consumers in California than in any other state. Accordingly, the state of California has a special interest in regulating the misconduct of corporations like JUUL who work from and do business in the state.

188.    JUUL committed false advertising when its products did not conform to its representations about JUUL pods' nicotine content, the pharmacokinetics of JUUL use, and JUUL pods' cigarette equivalence. JUUL engaged in an extensive campaign to convey their products as less harmful than combustible cigarettes and, in some cases, not harmful at all. As discussed herein, JUUL products contain and deliver significantly more nicotine than JUUL represented in advertisements and public statements: JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised; JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette; and the nicotine content of JUUL pods is closer to 24 cigarettes, or at least 20% more than one pack. Those claims were known or should have been known by JUUL to be false and misleading at the time JUUL made and widely disseminated them. Whether by design or defect, these characteristics of JUUL's products cause, maintain, or aggravate nicotine addiction and subject consumers to harm caused by increased exposure to nicotine as described herein.

189.    JUUL's actions in violation of § 17500 were false and misleading such that Plaintiffs, the Proposed Sub-Classes, and the general public are and were likely to be deceived and led to believe the JUUL products were less harmful and addictive than they really were. Plaintiffs, and those similarly situated, relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would have acted differently by not purchasing a JUUL E-cigarette and JUULpods.

190.    Each of the Plaintiffs saw at least one advertisement in JUUL's long, pervasive advertising campaign, and each was exposed to the false messages conveyed by the campaign (about JUUL pods' nicotine content, the pharmacokinetics of JUUL use, and JUUL pods' cigarette equivalence). JUUL's campaign lasted approximately three years and was pervasive on social media. Because of the length and pervasiveness of the campaign, it is not reasonable for each Plaintiff to identify in this Complaint every ad seen, but a complete gallery of marketing materials is available at http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_mt068.php.

191.    As a direct and proximate result of JUUL's false advertising practices, Plaintiffs and the members of the Class and subclasses have been damaged and are entitled to recover actual damages, restitution, statutory damages and punitive damages to the extent permitted by law, in an amount to be proven at trial.

## III.    COUNT III: Fraud (on behalf of the Class)

192.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

193.    Defendant fraudulently and deceptively sold JUUL products to Plaintiffs and Class Members by omitting to disclose the highly addictive nature of JUUL products.

194.    Further, Defendant fraudulently and deceptively failed to disclose to Plaintiffs and Class Members the highly addictive nature of JUUL's pod formulation, the nicotine content of JUUL e-liquid

and the aerosol it produces and use of nicotine and benzoic acid to deliver a materially more significant nicotine load than in a single package of cigarettes.

195.    Moreover, Defendant fraudulently and deceptively failed to disclose to Plaintiffs and Class Members that the nicotine salts in JUUL pods delivered nicotine at a higher rate than other e-cigarettes and conventional cigarettes, which was likely to make the nicotine addiction associated with JUUL products stronger and more severe than that associated with other e-cigarettes and conventional cigarettes.

196.    Defendant also fraudulently and deceptively informed Plaintiffs that they would be able to cease purchasing JUULpods "anytime," when they knew it to be untrue.

197.    Defendant made each of these misrepresentations and omissions to those similarly situated as Plaintiffs.

198.    Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs, and those similarly situated, as to whether to purchase a JUUL E-cigarette and JUULpod. Defendant had a duty to accurately provide this information to Plaintiffs, and those similarly situated. In not so informing Plaintiffs, and those similarly situated, Defendant breached its duty to each of them. Defendant also gained financially from, and as a result of, its breach.

199.    Plaintiffs, and those similarly situated, relied to their detriment on Defendant's omissions. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation not purchasing a JUUL E-cigarette or JUULpod(s) and not subscribing to Defendant's "Auto-ship" service.

200.    Plaintiffs allege the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Defendant:

201.    **Who**: Defendant actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes from Plaintiffs and Class Members while simultaneously disclosing false or misleading evidence concerning nicotine content. Defendant also actively concealed the benzoic acid content of

the JUUL e-cigarettes, while knowing that benzoic acid played a central role in determining the physiological effects of JUUL e-cigarettes. Defendant also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and Defendant did so without notifying Plaintiffs. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at JUUL or PAX responsible for such decisions.

202.    **What**: Defendant knew, or was negligent or reckless in not knowing, that the JUUL e-cigarettes were likely to aggravate nicotine addiction in smokers and posed extreme risks of addiction to children and made misrepresentations about the risks, effects, operation, content, and other attributes of JUUL e-cigarettes. These misrepresentations include both omissions of nicotine warning, omission of facts regarding the increased potency and addictiveness of nicotine salts, misrepresentations about the amount of nicotine in JUULpods and the absorption thereof through use of JUUL, and misrepresentations of using JUUL as a fun, healthy activity for young people, without disclosing the long-term health effects and the actual feeling of being addicted to nicotine.

203.    **When:** Defendant concealed material information regarding the effect of JUUL e-cigarettes at all times and made representations from the time when the JUUL e-cigarette was announced to this day. Defendant still has not disclosed the truth about JUUL e-cigarettes. Defendant has amplified and cemented these misrepresentations in the minds of the public through its unprecedented social media efforts, the full scope of which is not yet fully known.

204.    **Where**: Defendant concealed material information and made misrepresentations regarding the true nature of JUUL e-cigarettes' nicotine formula on JUUL's websites, interviews with the media, promotional materials, and through social media. Plaintiffs are aware of no document, communication, or other place or thing in which Defendant discloses consistent or truthful statements about JUUL e-cigarettes' potency or its actual nicotine content. Such information is not disclosed on JUUL's website or in any marketing materials or advertising materials.

205.    **How**: Defendant concealed critical information from Plaintiffs and Class Members concerning the potency and effects of JUUL use or made representations about the nicotine content

and potency of the JUUL e-cigarettes that were false or misleading. Defendant actively concealed the truth about the real impact of JUUL e-cigarette use from Plaintiffs and Class Members at all times, even though it knew such information would be important to a reasonable consumer, and Defendant promised in JUUL's marketing materials that the JUUL e-cigarettes have qualities that they do not have.

206.    **Why**: Defendant actively concealed material information about the potency of JUUL e-cigarettes for the purpose of inducing Plaintiffs and Class Members to purchase and/or use JUUL e-cigarettes. Had Defendant disclosed the truth—that the JUUL e-cigarette was, by design, more physically addictive than cigarettes, for example in its advertisements or other materials or communications, Plaintiffs and Class Members (all reasonable consumers) would have been aware of this fact, and would not have bought JUUL e-cigarettes or would have used them in a way that posed fewer risks of creating or aggravating nicotine addiction.

207.    More information about each of these elements is provided in greater detail in the body of this complaint, above.

208.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs, and those similarly situated, to alter their positions to their detriment.

209.    Plaintiffs, and those similarly situated, justifiably and reasonably relied on Defendant's misrepresentations and/or omissions, and, accordingly, were damaged by the Defendant.

210.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs, and those similarly situated, have suffered damages in an amount equal to the amount that Defendant charged them.

211.    Defendant's conduct as described herein was willful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiff, and those similarly situated.

IV.    **COUNT IV: Negligent Misrepresentation (on behalf of the Class)**

212.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

213.     The elements of negligence are essentially identical in each of the states for which a subclass has been identified, *i.e.*, duty, breach of duty, causation, and harm.

214.     Upon marketing and offering the JUUL products for sale, Defendant also had a duty and owed a duty to Plaintiffs and Class Members to exercise a degree of care a reasonable e-cigarette manufacturer would exercise under like circumstances to accurately represent the nicotine content and delivery of their products as well as the products' corresponding addictive potential.

215.     As alleged above, Defendant has misrepresented the nicotine content of JUULpods on its label and in its marketing. And as alleged above, Defendant has also misrepresented the potency and addictiveness of its nicotine salt formulation, the suitability of JUULpods as a "treat" to be enjoyed with meals, the nicotine content of JUULpods, and the use of JUULpods as a cool, fun, healthy activity rather than a means of delivering a highly addictive dose of nicotine.

216.     When making these statements, Defendant was aware that these representations were false or made them without knowledge of their truth or veracity.

217.     The negligent misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and all Class members to purchase the products at issue.

218.     Plaintiffs would not have purchased JULL e-cigarettes, or would not have purchased the products on the same terms, if Plaintiffs had known the truth of the facts misrepresented by Defendant.

219.     Because of Defendant's conduct, minor Plaintiffs and Class Members have been significantly exposed to toxic substances, including nicotine, additives, and other toxic compounds in JUUL e-liquid and delivered in the aerosol JUUL produces, and as a result of this exposure, have suffered increased risk of illness, disease or disease process, requiring an award of the cost of a program for monitoring for detection of such illness, disease process or disease. Early detection of illness, disease or disease process will benefit Plaintiffs and Class Members.

220.     Plaintiffs and Class members are entitled to damages and other legal and equitable relief as a result.

**V.    COUNT V: Negligent Misrepresentation and Marketing to Underage Youth (on behalf of the Youth Subclass)**

221.    Plaintiffs repeat, reallege, and incorporate by reference the foregoing allegations as though fully stated herein.

222.    Upon marketing and offering the JUUL products for sale, Defendant owed numerous duties to Plaintiffs and Youth Subclass Members, including to:

    a.    exercise reasonable care in ensuring that its marketing does not target minors, including Plaintiffs and Youth Subclass Members;

    b.    exercise the degree of care a reasonable e-cigarette manufacturer would exercise under like circumstances to ensure its products were not sold and/or distributed to minors, including Plaintiffs and Youth Subclass Members;

    c.    use reasonable and adequate procedures that are compliant with industry-standard practices in ensuring that distributors and retailers of its electronic cigarette devices and JUULpods do not sell and/or distribute them to minors, including Plaintiffs and Youth Subclass Members; and

    d.    implement processes to quickly detect whether its electronic cigarette devices and JUULpods are sold and/or distributed to minors and to timely act on this information to eliminate the sale and/or distribution of electronic cigarette devices and JUULpods to minors.

223.    Under several states' laws, JUUL owes a statutory duty to Plaintiffs and Youth Subclass members to not sell and/or distribute its electronic cigarette devices and JUULpods to minors and to undertake appropriate measures to comply with this mandate.[36]

---

[36] These state laws include: ALA. CODE § 28-11-13(a); ALASKA STAT. § 11.76.109; ARIZ. REV. STAT. § 13-3622(A); ARK. CODE ANN. § 5-27-227(a)(1); CAL. BUS. & PROF. CODE §§ 22958(a) and 22963(a); CAL. PENAL CODE § 308(a)(1)(A); CAL. BUS. & PROF. CODE §§ 22963 (a), (b); COLO. REV. STAT. §§ 18-13121(1)(a) and 44-7-103; CONN. GEN. STAT. § 53- 344b(b); DEL. CODE ANN. tit. 11, §§ 1116(a) and 1118(a); D.C. Code § 7-1721.02; FLA. STAT. § 877.112(2)–(3); GA. CODE ANN. § 16-12-171(a)(1)(A); HAW. REV. STAT. § 7121258(1) and § 245-(a); IDAHO CODE ANN. §§ 39-5705(1) and39-5714(1); 720 ILL. COMP. STAT. 675/1.5(b) and 720 ILL. COMP. STAT. 675/1.5(c)(2); IND. CODE §§ 35-46-1-10(a), 35-46-1-10.2(a); §§ 7.1-7-5.5-1; 7.1-7-5.5- 5; 7.1-7-5.5- 3; 7.1-7-5.5-2; IND. CODE § 7.1-7-4-6(b); IOWA CODE ANN. § 453A.2(1); KAN. STAT. ANN. § 79-3321(l); KY. REV. STAT. ANN. §§ 438.310(1); 438.313(1) 438.315(1); LA. REV. STAT. ANN. §§ 14:91.8(C); 26:911(A)(1); and 14:91.6(A); ME. REV. STAT. ANN. tit. 22 § 1555-B (2); MD. CODE

224.    JUUL knew the risks that minors would be attracted to and prone to buy JUUL's electronic cigarette devices and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors.

225.    Defendant breached its duties to minors, including Plaintiffs and Youth Subclass Members, in several ways, including by:

a.   designing and manufacturing a product that, due to its ease of inhalation, deceptive flavoring and nicotine potency, is hazardous to foreseeable users, namely minors;

b.   permitting JUUL products to be marketed and sold to minors, including Plaintiffs and Youth Subclass Members, through their website, online, and through brick-and-mortar retailers, where identification and proof of age were not required for purchase and acquisition of the JUUL products;

c.   permitting the implementation of inadequate systems, protocols and practices by itself and by its distributors and retailers that allowed minors to purchase and/or receive its electronic cigarette devices and JUULpods, creating a foreseeable risk of harm;

d.   inducing the purchase of JUUL e-cigarettes and JUULpods by minors through marketing its products to youth and adolescents, such as through the use of "viral" social media campaigns, and by fostering a "cool," youthful image;

---

ANN., HEALTH GEN. § 24- 305(b); MD. CODE ANN., CRIM LAW §§ 10- 107(b)(2), (c)(1); MASS. GEN. LAW ch. 270 § 6 (b), 940 MASS. CODE REGS. 21.04(3), and 940 MASS. CODE REGS. 21.04(1)(c), (4)(a); MINN. STAT. §§ 609.685(1)(a), (2)(a); MISS. CODE ANN. § 97-32-51(2); MO. REV. STAT. §§ 407.926.1 and 407.931.1; NEB. REV. STAT. §§ 28-1419; 28-1425; NEV. REV. STAT. ANN. § 202.2493.2; N.H. REV. STAT. ANN. §§ 126-K:4(I); 126K:8(I); N.J. STAT. §§ 2A:170-51.4(a)(2) and 2C:33-13.1(a); N.M. STAT. ANN. §§ 30-493(A),(E); 30-49-8(A); N.Y. PUB. HEALTH LAW §§ 1399-cc(2), 1399-bb(4), and 1399-bb(5); N.C. GEN. STAT. § 14-313(b) and N.C. GEN. STAT. § 14-313(b2); N.D. CENT. CODE § 12.1-3103(1)(a); OHIO REV. CODE ANN. § 2927.02(B)(1); OKLA. STAT. tit. 37 §§ 600.3(A) and 600.13(A); OR. REV. STAT. ANN. §§ 167.755(1); R.I. GEN. LAWS ANN. §§ 11-9-13, 11-9-13.10 and 11-9-13.8(1); S.C. CODE ANN. §§ 16-17-500(A); 16-17- 502(A); S.D. CODIFIED LAWS § 34-46-2(1); TENN. CODE ANN. § 39-17-1504(a) and § 39-17-1504(d); TEX. HEALTH & SAFETY CODE ANN. §§ 161.082, 161.087 and 161.452(c); UTAH CODE ANN. § 76-10-104(1); 7 VT. STAT. ANN § 1003(a); VA. CODE ANN. § 18.2-371.2(A), VA. CODE ANN. § 18.2- 371.2(C); WASH. REV. CODE ANN. § 26.28.080(1) and § 70.345.090(1)-(7); W. VA. CODE ANN. § 16-9A-2(b)(3); WIS. STAT. ANN. § 134.66(2)(a); and WYO. STAT. ANN §§ 14-3-302(a),(c).

e.  failing to comply with the minimum industry standards with respect to its distributors and retailers; and,

f.  failing to take timely, affirmative steps to eliminate the sale and/or distribution of e-cigarettes to minors when it knew that minors were purchasing and receiving its e-cigarettes.

226.  Defendant breached their duty to minors, including Plaintiffs and Class Members, by misrepresenting and otherwise failing to accurately represent the nicotine content and delivery of their products as well as by misrepresenting and otherwise failing to accurately represent the products' corresponding addictive potential.

227.  Upon marketing and offering the JUUL products for sale, Defendant also owed a duty to Plaintiffs and Youth Subclass Members to exercise a degree of care a reasonable e-cigarette manufacturer would exercise under like circumstances to accurately represent and to adequately warn of the special health hazards to minors of using JUUL products including, but not limited to, the presence of toxic compounds in JUUL e-liquids and the delivery of these compounds and other toxic compounds in JUUL aerosol as well as the especially high hazard of nicotine addiction and the concomitant health hazards that addictive, *i.e.*, compulsive use of the JUUL products would bring about.

228.  Defendant breached its duty to minors, including Plaintiffs and Youth Subclass Members, by failing to accurately represent and adequately warn of the health hazards of underage use of JUUL products including, but not limited to, those identified in the preceding paragraph.

229.  Defendant's breach of its duties, and each of them, proximately caused harm to Plaintiffs and Youth Subclass Members. But for Defendant's breach of its duties, such harms would not have occurred.

230.  Defendant's lack of sufficient disclosure was a substantial factor in causing harm to Plaintiffs and Youth Subclass Members.

231.  Because of Defendant's conduct, minor Plaintiffs and Youth Subclass Members have been significantly exposed to toxic substances, including nicotine, additives, and other toxic compounds in JUUL e-liquid and delivered in the aerosol JUUL produces, and as a result of this exposure, have suffered increased risk of illness, disease or disease process, requiring an award of the cost of a program

for monitoring for detection of such illness, disease process or disease. Early detection of illness, disease or disease process will benefit Plaintiffs and Youth Subclass Members.

232.    Because of Defendant's conduct, minor Plaintiffs and Youth Subclass Members have been significantly exposed to toxic and highly addictive substances, including nicotine, additives, and other toxic compounds in JUUL e liquid and delivered in the aerosol JUUL produces, and as a result of this exposure, they have suffered the need for smoking/vaping education and cessation counseling, requiring an award of the cost of a program for education and cessation.

## VI.    COUNT VI: Strict Liability Failure to Warn (on behalf of the Class and Youth Subclass)

233.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

234.    Defendant designed, manufactured, distributed and sold JUUL devices and JUULpods.

235.    Defendant was aware that the JUUL devices, when used in conjunction with JUULpods, had risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUULpods.

236.    The use of JUUL devices and JUUL pods presented a substantial danger of nicotine exposure and addiction as described herein when a JUUL device was used with a JUULpod. This danger was even greater with regard to youths and adolescents.

237.    Plaintiffs and members of the Class were not aware and would not have recognized the risks of using a JUUL device with a JUULpod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

238.    Plaintiffs and members of Youth Subclass also were not aware of the risk the JUUL device and JUUL pods pose to youths and adolescents. Plaintiffs and members of the Youth Subclass were unable to appreciate the potential dangers, risks, and consequences of using a JUUL device with a JUUL pod because of their youth, inexperience and/or immaturity of judgment.

239.     In all forms of advertising as well as social media communications, Defendant failed to adequately warn or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendant failed to adequately warn in its advertising, social media communications, or anywhere on the product label that the product was not safe for minors and should not be used or consumed by them. Instead, as described herein, Defendant marketed its products to minors and made them available in youth-friendly colors and flavors. Defendant also designed its products to be more palatable to youth and nonsmokers by reducing "throat hit" and increased the level of nicotine that is absorbed by users, making them even more addictive.

240.     JUUL also failed to warn that its products did not conform to JUUL's representations about JUUL pods' nicotine content, the pharmacokinetics of JUUL use, and JUUL pods' cigarette equivalence. JUUL products contain and deliver significantly more nicotine than JUUL represents. As described herein, JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette and the nicotine content of JUULpods is closer to 24 cigarettes, or at least 20% more than one pack. Whether by design or defect, these characteristics of JUUL's products cause, maintain, or aggravate nicotine addiction and subject consumers to harm caused by increased exposure to nicotine as described herein.

241.     The JUUL devices and pods were expected to be used by Plaintiffs and Members of the Class and Youth Subclass without substantial change in their condition from the time of their manufacture or sale.

242.     By selling JUUL products to consumers like Plaintiffs and Class and Youth Subclass members when it already knew of the products' dangerous qualities through internal testing and published reports, JUUL is strictly liable for the injuries that JUULpods and devices have caused and will cause to Plaintiffs and Members of the Class and Youth Subclass.

243.     Defendant's lack of sufficient instructions or warnings were a substantial factor in causing harm to Plaintiffs identified above.

244.    Plaintiffs and the members of the Class and Youth Subclass were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the JUUL products as a result of Defendant's failure to warn and misrepresentations; (c) they purchased JUUL products that did not have the characteristics, qualities, or value affirmed and promised by Defendant; and (d) they have become addicted to nicotine and will need to undertake nicotine cessation treatments.

## VII.    COUNT VII: Negligent Failure to Warn (on behalf of the Class and Youth Subclass)

245.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

246.    Defendant owed a duty to all persons, including youths and adolescents, who were reasonably foreseeable users of Defendant's products, to design, develop, formulate, test, and manufacture a product reasonably free of defect. JUUL had a duty to disclose to consumers, including youths and adolescents, the foreseeable risks associated with the use of JUUL devices and pods, including that the JUUL devices and pods were particularly unsafe for youths and adolescents due to their increased vulnerability to nicotine addiction.

247.    At the time Defendant manufactured, distributed and sold JUUL devices and JUULpods, Defendant was aware that the JUUL devices, when used in conjunction with JUULpods, had risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of the products, including that the JUUL devices and pods were particularly harmful to youths and adolescents.

248.    Defendant was negligent in that it knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious to nonsmokers, youths and adolescents, including the Plaintiffs and members of the Class and Youth Subclass, but failed to use reasonable care to warn Plaintiffs and members of the Youth Subclass of the potentially harmful and injurious effects in the manner that a reasonable person would under the same or similar circumstances.

249.    The use of JUUL devices and JUUL pods presented a substantial danger of causing persons, particularly youths and adolescents, the harms of nicotine exposure and addiction as described herein when a JUUL device was used or misused with a JUUL pod in an intended or reasonably foreseeable way by youths and adolescents.

250.    Plaintiffs and members of the Class and Youth Subclass were not aware and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction that the JUUL device and JUULpods pose, particularly to youths and adolescents. Plaintiffs and members of the Class were unable due to Defendant's conduct to appreciate the potential dangers, risks, and consequences of using a JUUL device with a JUULpod; the members of the Youth Subclass were particularly unable to so appreciate because of their youth, inexperience, and/or immaturity of judgment.

251.    JUUL failed to exercise reasonable care and give adequate warnings or instructions to consumers, particularly youths and adolescents, including Plaintiffs and Members of the Class and Youth Subclass, about the reasonably foreseeable dangers that could result from using JUUL's devices and pods under reasonably foreseeable conditions. JUUL knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products, the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, they would recklessly disregard such risks.

252.    In all forms of advertising as well as social media communications, Defendant failed to adequately warn or instruct foreseeable users, particularly youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendant failed to adequately warn in its advertising, social media communications, or anywhere on the product label that the product was not safe for minors and should not be used or consumed by them. Instead, as described herein, Defendant marketed its products to minors and made them available in youth-friendly colors and flavors.

253.     As described herein, JUUL products fail to conform to JUUL's affirmations of fact about JUUL pods' nicotine content, the pharmacokinetics of JUUL use, and JUUL pods' cigarette equivalence. JUUL products contain and deliver significantly more nicotine than JUUL represents. As described herein, JUULpods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette, and the nicotine content of JUUL pods is closer to 24 cigarettes, or 20% more than one pack. JUUL's products thus cause, maintain, or aggravate nicotine addiction and subject consumers, including Plaintiffs, to harms caused by increased exposure to nicotine.

254.     By marketing and selling JUUL products to consumers like Plaintiffs and members of the Class and Youth Subclass while it knew of the unreasonable dangers through internal testing and published reports, JUUL failed to change the formulation of JUUL products and breached its duty to warn Plaintiffs that the JUUL products were inconsistent with its affirmations of fact.

255.     Plaintiffs relied on JUUL's representations and advertising during the class period.

256.     Plaintiffs were harmed by Defendant's failure to warn. Defendant's lack of sufficient instructions or warnings were a substantial factor in causing harm to Plaintiffs and members of the Class and Youth Subclass.

257.     Plaintiffs and the members of the Class and Youth Subclass were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the JUUL products as a result of Defendant's failure to warn and misrepresentations; (c) they purchased JUUL products that did not have the characteristics, qualities, or value affirmed and promised by Defendant; and (d) they have become addicted to nicotine and will need to undertake nicotine cessation treatments.

**VIII.   COUNT VIII: California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. (on behalf of the Class)**

258.     Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

259.    JUUL operating in California has violated Cal. Bus. & Prof. Code §§ 17200, *et seq.*, by engaging in unlawful, unfair, or fraudulent business acts and practices and unfair, deceptive, untrue, or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. & Prof. Code § 17200 with respect to the products provided to the Plaintiffs and the Class, including but not limited to the following:

    a.   Engaging in deceptive acts and practices with regard to the products provided to the Class by: failing to disclose to Plaintiffs and the Class: that its pods contained higher levels of nicotine than advertised due to its unique and purposeful formulation using nicotine salts and benzoic acid; failing to disclose that JUULing delivered nicotine at a much higher rate than cigarettes, which was likely to make nicotine addiction more severe than smoking cigarettes or vaping other e cigarette products; failing to disclose the toxic compounds smokers are exposed to with JUUL's aerosolized nicotine mix; and by targeting its advertising to minors.

    b.   Engaging in unfair acts and practices with respect to its product by failing to disclose to Plaintiffs and the Class: that its pods contained higher levels of nicotine than advertised due to its unique and purposeful formulation using nicotine salts and benzoic acid; failing to disclose that JUULing delivered nicotine at a much higher rate than represented and at higher rates than cigarettes and other e-cigarettes, which was likely to make nicotine addiction more severe than smoking cigarettes or vaping other e-cigarette products; failing to disclose the toxic compounds smokers are exposed to with JUUL's aerosolized nicotine mix, and by targeting its advertising to minors. These unfair acts and practices were unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members. JUUL's practice was also contrary to legislatively declared and public policies that seek to protect minors from all forms of cigarette advertising. The harm these practices caused to Plaintiffs and Class Members outweighed their utility, if any.

    c.   Engaging in unlawful business practices by, among other things, violating Cal. Civ. Code §§ 1750, et seq. and specifically selling JUUL products to minors in violation of Cal. Bus. & Prof. Code §§ 22958(a); 22963(a) (2019); Cal. Penal Code § 308(a)(1)(A) (2019).

260.    Defendant has engaged and continue to engage in unfair, unlawful, and deceptive trade practices as outlined herein. In particular, Defendant has knowingly developed, sold, and promoted a product that contained nicotine at levels in excess of its representations with the intention of creating and fostering long-term addiction to JUUL products; failed to warn consumers about the dangers of its products including but not limited to its addictiveness, its use of a proprietary nicotine salt formulation that allows for nicotine to be absorbed more efficiently, quickly and in higher amounts than represented

and in higher amounts than in cigarettes and comparable vaping products; and promulgating an advertising campaign specifically targeting minors.

261.    These representations and omissions were material to Plaintiffs and Class Members.

262.    As a direct and proximate result of JUUL's unfair and unlawful practices and acts, Plaintiffs and Class Members were injured and lost money or property, including but not limited to the purchase of JUUL devices and JUUL pods.

263.    Plaintiffs and Class Members seek relief under Cal. Bus. & Prof. Code §§ 17200 et seq., including, but not limited to, restitution to Plaintiffs and Class Members of money or property that JUUL may have acquired by means of its deceptive, unlawful, and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civil Pro §1021.5), and injunctive or other equitable relief.

## IX.    COUNT IX: Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.203, et seq. (on behalf of the Florida Subclass)

264.    Plaintiff Krauel individually and on behalf of the other members of the Florida Subclass repeats, realleges, and incorporates by reference the foregoing allegations as though fully stated here.

265.    The express purpose of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2).

266.    FDUPTA §501.204(1) declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

267.    Manufacturing, selling, promoting e-cigarettes in interstate commerce are "consumer transaction[s]" in the scope of FDUPTA, and JUUL is a good within the meaning of that statute.

268.    Plaintiff Krauel and members of the Florida Subclass are "consumers" as defined by FDUPTA § 501.203.

269.    Defendant's unfair and deceptive practices are likely to mislead—and have misled—reasonable consumers, such as Plaintiff Krauel and the Members of the Florida Subclass, and therefore, violate Section 500.04, Florida Statutes.

270.    Defendant has engaged and continue to engage in unfair, unlawful, and deceptive trade practices in Florida as outlined herein. In particular, Defendant has knowingly developed, sold, and promoted a product that contained and delivered nicotine at levels in excess of its representations with the intention of creating and fostering long-term addiction to JUUL products; failed to warn consumers about the dangers of its products including but not limited to its addictiveness, its use of a proprietary nicotine salt formulation that allows for nicotine to be absorbed more efficiently, quickly and in higher amounts than represented and in higher amounts than in cigarettes and comparable vaping products; and promulgating an advertising campaign specifically targeting minors.

271.    By and through such misrepresentations and omissions, Defendant intended to induce Plaintiff Krauel and the Members of the Florida Subclass to detrimentally rely on the material safety omissions.

272.    Plaintiff Krauel and the Members of the Florida Subclass detrimentally relied on Defendant's misrepresentations and omissions. Had Plaintiff Krauel and the Members of the Florida Subclass been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation not purchasing a JUUL e cigarette or JUUL pod or purchasing fewer of them.

273.    Plaintiff Krauel and the Members of the Florida Subclass, as reasonable consumers, justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by the Defendant's actions.

274.    Plaintiff Krauel and the Members of the Florida Subclass reasonably relied to their detriment on Defendant's misrepresentations and omissions in that they purchased JUUL not knowing the true propensity of its dangers.

275.    Plaintiff Krauel and the Members of the Florida Subclass have sustained damages as a direct and proximate result of Defendant's deceptive and unfair trade practices.

276.    Plaintiff Krauel and the Members of the Florida Subclass seek injunctive relief to prohibit Defendant from continuing to engage in the unfair and deceptive advertising and marketing practices complained of in this complaint. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact.

277.    Pursuant to FDUPTA, §§ 501.211(2) and 501.2105, Plaintiff Krauel and the Members of the Florida Subclass make claims for damages, including punitive damages, attorney's fees, and costs. The damages suffered by the Plaintiff Krauel and the Members of the Florida Subclass were directly and proximately caused by Defendant's deceptive, misleading and unfair practices.

**X.    COUNT X: Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. §§ 10-1-370, _et seq._ (on behalf of the Georgia Subclass)**

278.    Plaintiff Savannah Smith individually and on behalf of the other members of the Georgia Subclass repeats, realleges, and incorporates by reference the foregoing allegations as though fully stated here.

279.    JUUL, Plaintiff Smith, and Georgia Subclass Members are "persons" within the meaning of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code Ann. § 10-1-371(5).

280.    The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a).

281.    Defendant has engaged and continues to engage in deceptive trade practices in Georgia as outlined herein. In particular, Defendant has knowingly developed, sold, and promoted a product that contained nicotine at levels in excess of its representations with the intention of creating and fostering long-term addiction to JUUL products; failed to warn consumers about the dangers of its products including but not limited to its addictiveness, its use of a proprietary nicotine salt formulation that allows for nicotine to be absorbed more efficiently, quickly and in higher amounts that cigarettes

and comparable vaping products; and promulgating an advertising campaign specifically targeting minors.

282.    JUUL also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with intent that others rely upon such concealment, suppression, or omission, in connection with the development, marketing and sales of its products.

283.    JUUL engaged in deceptive business practices in violation of the Georgia UDTPA by: (a) developing and marketing a product that contained nicotine levels far in excess of cigarettes with the intention of creating and fostering long-term addiction to JUUL products for minors to continue that addiction into adulthood; (b) falsely and deceptively marketing, advertising, and selling JUUL e-cigarettes and JUUL Pods by misrepresenting their nicotine content and nicotine pharmacokinetics, when in fact JUUL is likely to aggravate nicotine addiction; (c) creating advertising that lured minors into using JUUL e-cigarettes, and disseminating that advertising through unregulated social media platforms commonly used by most youth in the United States; (d) violating Ga. Code Ann. § 16 12 171(a)(1)(A) (2019) by selling and/or distributing nicotine products to persons who, at the time of sale, were under 18 years of age.

284.    JUUL intentionally and knowingly misrepresented such material facts with intent to mislead Plaintiff Smith and members of the Georgia Subclass.

285.    JUUL knew or should have known that its conduct violated the Georgia UDTPA.

286.    JUUL's representations and omissions were material to Plaintiff Smith and members of the Georgia Subclass given that the nature of the product affects the health and well-being of minors.

287.    Plaintiff Smith and Georgia Subclass Members suffered ascertainable loss caused by JUUL's misrepresentations and its concealment of and failure to disclose material information as alleged herein.

288.    JUUL had an ongoing duty to all JUUL customers, including Plaintiff Smith and Georgia Subclass Members, to refrain from unfair and deceptive practices under the Georgia UDTPA.

289.    JUUL's violations present a continuing risk to Plaintiff Smith and Georgia Subclass Members, as well as to the general public.

290.    JUUL's unlawful acts and practices complained of herein affect the public interest.

291.    As a direct and proximate result of JUUL's violations of the Georgia UDTPA, Plaintiff and Georgia Subclass Members have suffered injury-in-fact and/or actual damage.

292.    Plaintiff Smith and Georgia Subclass Members seek an order enjoining JUUL's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code Ann. § 10-1-373.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class and Subclasses demand a jury trial on all claims so triable and judgment as follows:

1. For the greater of actual or compensatory damages according to proof;

2. For restitution;

3. For injunctive relief;

4. An award of statutory damages, including as appropriate double or treble damages authorized by statute;

5. An award of compensatory damages, the amount of which is to be determined at trial;

6. An award of punitive damages, the amount of which is to be determined at trial;

7. For reasonable attorneys' fees according to proof;

8. For costs of suit incurred; and

9. For such further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand trial by jury on all counts for which a jury trial is permitted.

1  Dated: September 18, 2019                    Respectfully submitted,

2

3                                               _/s/ Sabita J. Soneji_____
                                                Sabita J. Soneji (State Bar No. 224262)
4                                               V Chai Oliver Prentice (State Bar No. 309807)
5                                               **TYCKO & ZAVAREEI LLP**
                                                1970 Broadway, Suite 1070
6                                               Oakland, CA 94612
                                                Telephone: (510) 254-6808
7                                               Facsimile: (202) 973-0950
                                                ssoneji@tzlegal.com
8                                               vprentice@tzlegal.com

9                                               Ariana J. Tadler (*Pro Hac Vice* Forthcoming)
10                                              A.J. de Bartolomeo (State Bar No. 136502)
                                                **TADLER LAW LLP**
11                                              One Pennsylvania Plaza, 36th Fl.
                                                New York, NY 10119
12                                              Telephone: (212) 946-9300
                                                Facsimile: (212) 273-4375
13                                              atadler@tadlerlaw.com
14                                              ajd@tadlerlaw.com

15
                                                *Counsel for Plaintiffs*
16                                              *and the Proposed Class*

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT A

### a. @JUULvapor "It's #MintMonday" Twitter Ad



### b. @JUULvapor "Sign up and stock up" on Flavors Twitter Ad



c. **@JUULvapor "Make the Satisfying Switch With JUUL" Twitter Ad**



d. **"Find Your Favorite Flavor" Twitter Ad**



e. **@JUULvapor "Not Your Average E-Cigarette" Twitter Ad**



**f. "JUUL Labs is not Big Tobacco" Ad**



**g. "Pack the Essentials" for Thanksgiving Holiday Ad**



**h. "Limited Edition Navy" JUUL Device Ad**



### i.  "$20 Off For First Time Purchasers" Ad



### j.  Examples of User-Generated Content Shared with #juul





















# ATTACHMENT B

a. **Vaporized Campaign Ads**



**b. Instore Displays**



### c. Window Displays



### d. Window Display for Mango JUULpods



e. **@JUULvapor Instagram "What's your flavor destination" Ads**



**f.  @JUULvapor repost of user's #JUULmoment**



**g.  @JUULvapor Instagram "Limited Edition cool cucumber" Ad**



### h. @JUULvapor Instagram Ad for Auto-shipments of Mango JUULpods



### i. JUUL "BACK IN STOCK" Ad



### j.  Examples of User-Generated Content Shared with #juul









# ATTACHMENT C

**a. Advertising Appearing on https://juul.com/calculator (Sep. 17, 2019)**

One 5% strength JUULpod is designed to replace one pack of cigarettes in both amount (20 cigarettes~200 puffs) and nicotine strength. If you consume JUULpods in a manner consistent with your current cigarette consumption, you may save $638.75[*] a year by switching to JUUL. Usage patterns may vary by user.

**b. Advertising Appearing on JUUL FAQ Page (Sep. 17, 2019)**

FAQS > JUULPOD BASICS

## JUULpod Basics

**How does a JUULpod work?**

JUUL uses a closed loop temperature control algorithm designed to deliver the ideal amount of power at any given time to the JUULpod. The liquid is heated using an industry standard wick and nichrome coil system.

**What is the nicotine concentration?**

Each JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight (approx. 40 mg per pod based upon 59 mg/mL) at time of manufacture. One JUULpod is intended to replace 1 pack of cigarettes, with ~200 puffs. However, individual smoking and vaping patterns may vary and nicotine content may decrease over an extended period of time.

**How many cigarettes = 1 pod?**

One JUULpod is intended to replace 1 pack of cigarettes, with ~200 puffs. However, individual smoking and vaping patterns may vary and nicotine content may decrease over an extended period of time.